**CANADA S. S. LINES, Limited, v. GREAT LAKES DREDGE & DOCK CO.**

No. 5414.

Circuit Court of Appeals, Seventh Circuit.
Dec. 31, 1935.

Rehearing Denied Feb. 28, 1936.

Robert Branand, Jr., and Edward B. Hayes, both of Chicago, Ill., for appellant.

Robert J. Folonie, of Chicago, Ill., for appellee.

Before EVANS and SPARKS, Circuit Judges, and MAJOR, District Judge.

SPARKS, Circuit Judge.

This action in admiralty was brought by appellant, as owner of the S. S. Brentwood, against appellee, as owner of the dredge New York, to recover for damages to the Brentwood and its cargo caused by its running aground in the Bayfield Channel of the St. Mary's River. The grounding is alleged to have been caused by the Brentwood being misled by a red light used by appellee as a danger marker for a swing anchor in connection with dredging operations in the channel, which light it was alleged was located on or near a spar buoy at or near the southerly edge of the channel. The court disallowed appellant's claims and dismissed the libel, and from that judgment this appeal is prosecuted.

Appellee was engaged in dredging the Bayfield Channel in the St. Mary's River, which is a navigable stream connecting Lakes Superior and Huron. For the purpose of marking a swing anchor for the dredge, appellee had placed above it a red lantern light, lashed to a spar, held upright by a chain attached to its lower end, which

light was located in the navigable channel, but outside the fairway. It is contended by appellant that this light was improper and unlawful and misled the Brentwood to its injury. It denies contributory negligence, but in case the court should find both parties to be at fault, it urges a division of the damages. Appellee, on the other hand, contends (1) that the light was a proper, usual and customary danger marker, not placed in aid of navigation, but was required by the applicable rules and authorized by the Government engineer in charge, and appellee was not guilty of any negligence with respect thereto, (2) that the injury was caused solely by the negligent navigation of the Brentwood.

A perusal of the entire record convinces us that a preponderance of the evidence supports the following facts: The occurrences in question took place in the waters of the United States, south of the Canadian boundary. The Bayfield Channel extended from the Sault Sainte Marie lock canal on the west to Little Rapids Cut on the east, and was less than two miles long. The general course of vessels downbound through the channel was easterly. The lights provided by the Government to mark the channel in the night time, as aids to navigation, consisted of range lights and channel markers. The front range light was twenty-four feet high and the rear one thirty-four feet high. They were gas lights which burned continuously and were located on Sugar Island and could be seen by the Brentwood at all times in question. They were 140 candle power and served as a guide through the center of the channel, which, unless partly obstructed, was one thousand feet wide. A straight line drawn through the two range lights would coincide with the center of the channel. The channel for navigation was under frequent change on account of dredging operations which had been in progress during the navigating season of 1933, and for some time prior thereto, and at the time in question the greater part of the north half of the channel was closed for dredging. As this work proceeded, it necessarily caused the north line of the navigating channel to be changed from time to time. It was marked with two blinker lights, which are referred to as channel marker lights. The west light, 24B, was about thirty feet north of the center of Bayfield Channel and three or four thousand feet east of the locks; the east light, 24A, was about fifty feet north of the center of the navigable channel, and about three thousand feet east of 24B. These lights flashed at intervals of five-tenths seconds on, and three and one-half seconds off. They marked the north side of the remaining fairway and were eleven feet in height to the focal plane of the light. They were thirty-five candle power and were more brilliant than an ordinary lantern. The open navigable channel south of the center line of Bayfield Channel was five hundred feet in width at its narrowest point. The south side of the navigable channel had a white channel marker light, referred to as Entrance Light 27, on the south side of Bayfield Channel near the intersection of that channel with Little Rapids Channel, and approximately at the entrance of Little Rapids Cut. It was a blinker light of one hundred twenty candle power and flashed at intervals of two and one-half seconds on, and two and one-half seconds off. Formerly there had been a white light further west of Entrance Light 27 on the south side of Bayfield Channel, but it had been removed more than a month prior to the night in question, and on that night there was no white light to mark the south side of Bayfield Channel between the locks and Light 27. About seventeen hundred feet west of this light was a black spar buoy which is referred to in the record as 27A.

Appellee's dredge was a suction dredge one hundred ten feet in length and at the time in question it was brilliantly lighted and in plain view. It was used in connection with a floating plant working in the navigable channel, but outside the fairway. It started operating on June 10, 1933, between 650 and 750 feet south of the navigable channel but not in it. It was at all times at a place where it was entitled to be with the consent of the Government engineers, under the War Department, and at the time of the incident in question those engineers had an inspector upon the dredge.

Appellee had placed a red light on a spar marking the location of a swing anchor for the dredge about 300 feet upstream from the black spar 27A, and about twenty-five feet south of the south line of the navigable channel. The dredge from time to time in its operations moved in an arc about the anchor as a pivot. The light was an ordinary lantern with a red globe, about four and one-half inches in diameter and eight inches in height, hung on a spar weighted at its lower end so that the upper end of the spar stood up out of the water.

The spar was two inches in diameter and extended about four feet above the water. The lantern was hung on a nail driven in the spar six or eight inches from its upper end, and the lower end of the lantern was lashed to the spar. It was used as a danger warning and not directly as an aid to navigation. The light was visible for over five miles, and it differed from lights 24A and B in that it was not a blinker light and was of much less candle power. The marking of a swing anchor with a red lantern hung on a spar was an approved marking of such anchor as supervised by the engineers of the War Department. Such marking had been customary for many years, and was a custom of which mariners generally had knowledge.

The United States Department of Commerce, prior to the incident in question, had published Pilot rules for the Great Lakes and their tributaries, and had incorporated therein rules and regulations of the Secretary of War governing the display of signals in connection with dredging and channel improvement work. Of these, Rules 5 and 11[1] are applicable, and the appellee's light in question reasonably complied therewith.

A reporting room was maintained at the locks where masters were required to report when passing. In that room was posted a map showing the channel markers and the conditions respecting dredging and channel occupation. At the time in question that map disclosed that dredging operations were in progress south of the fairway and that it was closed to navigation and was used as an anchorage ground. The master of the Brentwood had navigated this for many years prior thereto, and it had been the well-known custom of mariners in the connecting waters of the Great Lakes to keep all red channel lights to port when downbound and to starboard when upbound. The Brentwood was downbound and laden with grain. Its officers had in their possession the Government chart showing the general geographic conditions as they existed at the beginning of the season, and also, the hydrographic chart showing the position at that time of lights and channel markers which had been changed from time to time as necessity required. The Brentwood left the locks at 11:50 P. M. on June 14 and grounded not later than 12:10 A. M. on June 15, at a point about 1300 feet downstream from Black Spar 27A, and 700 feet upstream from Entrance Light 27, practically on a line between the two. The night was dark, the sky was somewhat overcast, and there was an intermittent drizzling rain, with a southwest wind, but the visibility was good.

The master, the second officer, and the wheelsman were in the pilot house of the Brentwood. On the charts in their possession there were indicated in the channel two red channel markers 24A and 24B to mark the north side of the fairway, and the white light 27 on the south side of the fairway near the turn into Little Rapids Channel. The lookout, the master, and the second officer observed three red lights in the Bayfield Channel, although the chart indicated but two channel marker lights. Two of those lights, 24A and B were practically in line with the range lights, as indicated by the hydrographic chart. The other red light, which was the appellee's swing anchor light, was south of the two red lights 24A and B and the range line. The crew of the Brentwood testified that appellee's anchor light appeared to them as a blinker light, yet the record does not disclose that they made any observation or undertook to determine that appellee's anchor light was regularly intermittent nor that its blinking was timed according to the timing of lights 24A and B, notwithstanding the fact that they passed south of and within fifty feet of appellee's light, and pursued their course beyond it for a distance of one-fourth of a mile before grounding.

Appellee's anchor light was seen by the

---

[1] "5. All the lights required by these special rules for dredges, wrecking boats, lighters, etc., shall be of such size and character as to be visible on a dark night with a clear atmosphere for a distance of at least two miles."

"11. Aids to navigation marking floating moorings. Breast, stern, and bow anchors of floating plant working in navigable channels shall be marked by barrel or other suitable buoys. By night approaching vessels shall be shown the location of adjacent buoys by throwing a suitable beam of light from said plant on the buoys until the approaching vessel has passed, or the buoys may be lighted by red lights, visible in all directions, of the same size and character as specified in rule 5 above: Provided, That the foregoing provisions of this paragraph shall not apply to floating plant working in the following waters of New York Harbor and adjacent waters; namely, the East River, the North River (Battery to Spuyten Duyvil) and the Harlem River."

Brentwood's lookout before he reached red light 24B, and at that time the range lights and the red lights 24B and 24A were practically in line, and appellee's anchor light was not dead ahead of the Brentwood but was to the south and off her starboard bow.

The Brentwood was straight with the channel when she passed 24B. She could have passed safely within fifty feet of that light, but she passed about two hundred feet south of it. In that location, however, the master could have used the range lights as an aid in keeping his course as he was so headed, and he could have employed Entrance Light 27 by keeping it over his starboard bow as a guide to keep in the navigable channel had he seen fit to do so, but he made no observation of the range lights, because, as he said, he was not interested in them.

To navigate a channel by use of range lights it is not necessary that the vessel be exactly in line with them. A competent navigator can tell how much he is off the line of the ranges by observing them, whether one hundred or three hundred feet. Before approaching 24B, where the Brentwood crossed the range line, the identity of 24B was determined by ascertaining that it was the range line, and there was nothing to prevent the identification of 24A in the same manner, had the navigator undertaken to do so.

When the Brentwood reached the red light 24B, the master for the first time undertook to locate red light 24A which was ahead of him to the port side. This he saw, and also saw appellee's red anchor light in a southerly direction from 24A and to the starboard, both of which, he said, looked like blinker lights, although his log referred to appellee's light as the "red stationary light," and said nothing about it being a blinker light. He thereupon undertook to, and did, pass to the south of appellee's light, and within fifty or sixty feet of it, but he made no further examination as he passed it, nor afterwards, as to whether it was a blinker light. From his position in the pilot house he could form no judgment of its height above the water. The two inch width of the spar to which the lantern was attached was no doubt sufficient to conceal the flame of the light from one who was on the opposite side of the spar, but it did not prevent the red light from shining continuously in every direction except in the direction of the spar. From the time he left the locks he paid but little, if any, attention to the channel marker lights and the range lights, as shown by the charts, which were placed there for his guidance and protection. He knew that after passing 24B he should, according to the charts, find one red channel marker, 24A, which, according to proper navigation, should be kept to his port side. He knew that it was illegal for anyone but the Government to put channel marker lights along a navigable stream, and he also knew that Government channel marker lights are timed so as to flash with regularity, and that it was his duty to exercise all reasonable care, under the circumstances of the situation, to distinguish between channel marker lights and other lights.

It was common for navigators to observe anchor lights which had some appearance of blinker lights because fastened to a spar, and such lights were to be reasonably anticipated by them.

The Brentwood did not stop, drop anchor, nor reverse her engines from the time the master first observed appellee's light, about a mile away, until his vessel was grounded after passing appellee's light a distance of about a fourth of a mile. The impact was of such force that it required two tugs to remove it, after it had been partly lightered.

From the locks to the place of grounding the only duties of the lookout which were undertaken to be performed were from the bridge, and so far as the record discloses no lookout was stationed on the vessel as far forward and as low as possible.

The greater weight of the evidence supports the following rules of seamanship: It is not good seamanship when navigating a channel, upon seeing a light that looks like a channel marker, not indicated on the chart, to assume that the chart is wrong. The proper course under such circumstances would be to sail on the ranges. The master is bound to stop his vessel if in doubt. Upon seeing a light not shown on his chart, the nature of which he does not know with certainty, the master should stop until he ascertains what it is, and if there is no other convenient way to stop he should turn about upstream and drop anchor. If an uncharted red light is seen, proper seamanship would indicate sailing on the ranges, and if in doubt as to the character of the light, the master should stop his ship, back his engines, and let go his anchor.

The allegations of the libel with respect to appellee's faults upon which appellant

seeks to recover are quite restricted in their scope. It is merely alleged that appellee placed, or caused to be placed, a red light on or near spar buoy 27A, which was improper and unlawful in that it was likely to lead navigators astray as to the correct location of the channel; that the officers of the Brentwood were thus misled to their damage, and were guilty of no negligence with respect thereto.

■ To support its contention that appellee's light was improperly and unlawfully placed, appellant relies upon a Federal statute, 33 U.S.C.A. § 759, which provides: "It shall be unlawful for any person, company, corporation, or municipality not under the control of the Commissioner of Lighthouses, to establish, erect, or maintain in the navigable waters of the United States any light as an aid to navigation, of any other aid to navigation similar to any of those maintained by the United States under the control and direction of the Commissioner of Lighthouses, without first obtaining permission so to do from the Commissioner of Lighthouses, in accordance with rules and regulations to be established by the Secretary of Commerce." In quoting this statute, appellant omits that part which provides for granting permission to do so by the Commissioner. The bill does not allege the lack of such permit, and the record does not disclose whether or not it was given. A fair construction of this statute would seem to be that it applies to lights of a permanent character, and unquestionably to those which are intended as an aid to navigation. To hold otherwise would prevent any sailing vessel having a white light, as required by law, from sailing in a channel, or mooring on its shore, or anchoring in anchorage grounds, without permission of the lighthouse keeper, where white lights are maintained by order of the Commissioner. It would likewise prevent the temporary display of a red light for a disabled vessel or anchor in or near a channel where red channel markers exist by order of the Commissioner.

■ It is not denied that the Secretary of Commerce is invested with power to promulgate rules and regulations to govern navigation, and it is likewise true that the War Department is invested with power to promulgate rules and regulations with respect to dredging operations. So far as this case is concerned, the two departments do not appear to be at cross purposes, for the Department of Commerce, as hereinbefore stated, has acquiesced in Rules 5 and 11 of the War Department with respect to the use of red lights for marking the anchors of dredges working in navigable channels. Moreover, the area in which this incident occurred had been lawfully removed from navigation and segregated as an area for dredging operations. In other words, it was withdrawn from the jurisdiction of the Department of Commerce, and of all these facts the master of the Brentwood had knowledge.

■ It is urged, however, by appellant that the War Department recognized appellee's light as an improper one because the engineers of that department, after the incident, directed that it be removed. From the record it is obvious that this order was given because the master of the Brentwood had informed the Government officers that appellee's light was located on Black Spar 27A, when in truth it was not thus located, but was at least twenty-five feet inside of the anchorage area, and that fact is not now controverted. In any event, we think that the weight of the evidence does not disclose that appellee's light was similar to the lights placed from time to time by the Government to mark the north edge of the channel, although the District Court found that it was. The case is tried here de novo, and while we should not lightly disregard the District Court's findings of fact, yet it is obvious that the only similarity lies in the fact that they were all red. In all other respects, as stated, they were dissimilar, and if a proper lookout had been maintained at the time when the Brentwood was nearest appellee's light, which was a quarter of a mile distant from the scene of the accident, the differences in the character of the lights would have been observed and the accident avoided. The entries in the master's log and his admissions of inattention to the range lights, and to appellee's light when he was sufficiently close to observe its character, prevent us from relying upon his statement that appellee's light appeared to be a blinker, or a channel marker, for he was bound to see what he could have seen had he looked. That he could have observed at a distance of fifty feet whether the light was blinking with regularity, if at all, we have no doubt, for visibility was good and others who saw it at a greater distance said it did not blink. It must be borne in mind that the master was here passing an uncharted red light and he was bound to use that degree of care which the unusual cir-

cumstances of the situation demanded. This, we think he did not do.

We recognize the admiralty rule that where respondent at the time of the accident was in actual violation of a statutory rule, the burden is upon him not only to show that his fault did not contribute to the disaster, but that it could not have done so. We are convinced, however, that the rule is not here applicable because appellee did not violate any statute and was not otherwise guilty of negligence which in any way contributed to the accident. We are unable to arrive at any other conclusion than that the accident was caused solely by the negligence of appellant's officers.

There was evidence admitted to the effect that a red light similar to Government markers on the wrong side of the channel was a menace to navigation. In admitting this evidence the court said that he was of the opinion that it was incompetent, and if upon further consideration he was still of the same opinion, he would disregard it. He later sustained appellee's objections to like evidence, and we are warranted in concluding that he disregarded that which had been admitted. We could readily admit that such a light uncharted would be a menace to navigation but from what we have said we are convinced that appellee's light was not materially similar to the Government lights.

We are in accord with the judgment of the District Court in dismissing the libel.

Judgment affirmed.