**AFRAN TRANSPORT COMPANY, as owner of the steamhip NORTH-ERN GULF, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**BRITISH AMERICAN OIL CO., LTD., Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

and

**SS Northern Gulf and Afran Transport Company, Claimant-Third Party Defendant.**

**Nos. 64 AD. 249, 64 AD. 421.**

United States District Court, S. D. New York.

Aug. 26, 1969.

Burlingham, Underwood, Wright, White & Lord, New York City, Joseph C. Smith, Stanley R. Wright, Frank L. Wiswall, Jr., New York City, of counsel, for Afran.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, George Warburton, New York City, of counsel, for British American Oil Co.

Louis E. Greco, U. S. Dept. of Justice, Admiralty and Shipping Section, New York City, Philip A. Berns, New York City, of counsel, for defendant United States of America.

## OPINION

TENNEY, District Judge.

 These actions were brought by plaintiff Afran Transport Company (hereinafter referred to as "Afran") as owner of the Steamship NORTHERN GULF, and plaintiff British American Oil Co., Ltd. (hereinafter referred to as "British American"), the cargo owner, to recover damages from defendant United States of America resulting from the stranding of said vessel in the harbor of Portland, Maine.[1] These are actions in

---

1. Defendant impleaded Afran in the action brought by British American and both actions were consolidated for the purpose of trial.

admiralty for which a remedy is provided under the Suits in Admiralty Act, as amended in 1960, 46 U.S.C. § 741 *et seq.*; Wilcox v. United States, 1964 A.M.C. 1206 (S.D.N.Y.1964); Tankrederiet Gefion A/S v. United States, 241 F.Supp. 83 (E.D.Mich.1964). Interest is allowable on any damages that may be awarded from the date that suit was filed. Petition of Oskar Tiedemann & Co., 236 F.Supp. 895, 910 (D.Del.1964). At the trial, four witnesses testified for Afran and British American, and one witness testified in behalf of the United States. Thirty-one witnesses testified by deposition.

On the morning of November 25, 1963, the tanker NORTHERN GULF, a single screw supertanker of 696 feet 4 inches overall length, 90 feet 6 inches breadth, 48-ft. depth, with a cargo of crude oil and a draft of 35 feet 6 inches forward and aft, arrived off Portland Lightship on a voyage from Bandar, Mashur, to Portland, Maine, and passed that vessel at about 0900 hours.[2] She was laden with British American's cargo of approximately 261,429 U. S. Barrels of Iranian crude oil destined for the Canadian Pipeland dock at Portland, Maine, for delivery to British American as consignees.[3] The weather was clear, visibility good (9 to 10 miles), wind moderate N/W, tide last of ebb.[4] On course 276 degrees true, she brought the Lightship abeam 700 yards off her portside, fixing the position with a radar range and visual bearing on that vessel, and then changed course to the right, reducing speed to slow ahead.[5] Shortly thereafter, the engine was stopped and put full astern to take aboard a compulsory state pilot from a pilot boat positioned

about one-half mile N/W of the Lightship, the pilot boarding and taking the conn at about 0910, at which time the engines were on one-half ahead, wheel hard left. Present on the bridge were the master, third officer, quartermaster, lookout, deck cadet and, at various times, the first mate. NORTHERN GULF was equipped with gyro-compass repeaters on both wings of her bridge and with bearing or azimuth circles, binoculars, radar and fathometer.[6] On being advised by the master that there was no gyro error, the pilot ordered full ahead with the wheel still at hard left until the vessel reached and steadied on a heading of 315 degrees true, at which time he had Portland Light fine on the port bow and West Cod Ledge Rock Buoy No. 2 fifteen degrees on the starboard bow, with the course set to pass one-quarter mile off that buoy.[7] The vessel remained on course 315 degrees true for about twelve minutes.[8] Approaching Buoy No. 2, the engine speed was reduced to half ahead, and when that buoy was about two points forward of the starboard beam and 600 yards off, the order full right rudder was given, the indicator showing a 15-degree starboard rudder angle, the vessel requiring one to two minutes to answer the helm, and the course changing slowly to the right toward Witch Rock Buoy, the customary route for deep draft vessels.[9] The change of course was begun at approximately 0924–0925 hours (course recorder time) with the vessel's heading changing to the right to 352 degrees true at approximately 0926½ (course recorder time) and thence to the left to 346¼ degrees true at approximately 0927 (course recorder time), at which time she was making about six knots

2. Agreed Finding of Fact No. 1 (Affid. 1); Exh. 1.

3. Affid. 17.

4. Exh. A; Tr. 107.

5. Exhs. 4 at 5; 15; 19 at 8; 21.

6. Tr. 46; Exh. 29; Tr. 56; Exh. 4 at 13; Exh. 15; Affid. 4; Exh. F at 35, 37–38; Exh. 18 at 16, 20; Exh. 19 at 27.

7. Tr. 48, 50; Exh. 29; Exh. A at 1; Affid. 5; Tr. 173; Exh. 4 at 14; Exh. 29.

8. Tr. 57, 118.

9. Exh. 21; Affid. 7; Exh. 29; Tr. 277; Tr. 58–60.

(200 yards per minute).[10] At about 0929½ (log book time) West Cod Ledge Buoy No. 2 came abeam to starboard about 300 yards off.[11] It was about two hours before low water with the tide running at ½ knot or less in a N/W-S/W direction, wind from the N-N/W at 15 to 17 knots.[12] The vessel remained on a course of 346¼ degrees true, travelling at a speed of six knots until she stranded some time between 0930 and 0931 (0930½ course recorder time) on the westernmost shoal of West Cod Ledge with Buoy No. 2 bearing 107 degrees true about 400 yards to starboard.[13] Immediately following the stranding, the Coast Guard established that the buoy was in 75 feet of water and 350–400 yards, bearing 097¾ degrees, from its charted position.[14] If the buoy had been on its charted position, NORTHERN GULF would have passed 350 to 400 yards to the west of her stranded position, in 80 to 90 feet of water and well clear of West Cod Ledge Rock.[15]

## WEST COD LEDGE ROCK BUOY No. 2

■ West Cod Ledge Rock Buoy No. 2 was established in 1914 and was maintained by defendant as a floating aid to navigation marking the position of West Cod Ledge.[16] It is described in the List of Lights as located "[i]n 60 feet, south of rock east of Cape Elizabeth", a red lighted buoy with its light 12 feet above the water.[17] It seems clear that the Ledge is a hazard to deep laden vessels of the size of NORTHERN GULF.[18] Nor is it disputed that on November 25, 1963, NORTHERN GULF'S pilot and navigators relied on Buoy No. 2 to pass safely by West Cod Ledge Rock.[19] Official records establish that

the buoy had a good history of remaining on its charted position and most pilots entering Casco Bay and Portland Harbor in deeply-laden vessels relied solely on the buoy to determine their positions with respect to West Cod Ledge Rock, to pass safely by and to make the course changes toward Witch Rock Buoy.[20] There had been no published report that the buoy was off station prior to the stranding and many deep-laden vessels had proceeded between Corwin Rock Buoy No. 3 and West Cod Ledge Rock Buoy No. 2 from December 11, 1962 and until November 25, 1963 without stranding.[21] Indeed NORTHERN GULF with the same master proceeded safely through the area on April 30, 1963.[22] Nevertheless, I find that Buoy No. 2 was off station in the general location where found at the time of the stranding, and for a period of approximately eight months prior to November 25, 1963. It is, of course, true that "mere proof of the existence of a state of facts does not raise a presumption that the same condition of facts existed at a prior date, since inferences or presumptions of fact ordinarily do not run backward." Russell, Poling & Co. v. Conners Standard Marine Corp., 252 F.2d 167, 170 (2d Cir. 1958). However, in the instant case three Portland lobstermen testified by deposition that they discovered the buoy off its normal position in the spring of 1963 and that it was in the same position on November 25, 1963 until it was moved back on its charted position by the Coast Guard shortly after the stranding.[23] The fact that other vessels successfully traversed the area is easily explainable since the 7' to 11' 5" tide range would permit vessels drawing more than NORTHERN GULF to pass over the very same spot at high

10. Affid. 8.

11. Exh. 12.

12. Tr. 131–133.

13. Tr. 125–127; Affid. 8.

14. Affid. 9.

15. Affid. 13; Exhs. 29 and 33; Tr. 283.

16. Affid. 2.

17. Exh. 17.

18. Affid. 2.

19. Affid. 21.

20. Affids. 2, 12.

21. Affids. 10, 11.

22. Affid. 11.

23. Exhs. 23, 24 and 27.

water.[24] In contradiction to the testimony of the lobstermen, defendant failed to produce a single witness from Portland Light Vessel, Cape Elizabeth Lightship, the buoy tender COWSLIP or from the four Coast Guard cutters stationed in that vicinity who could say that the position of No. 2 Buoy had been checked by cross-bearings or sextant angles at any time after it was first found off station by the lobstermen in the spring of 1963 until after the stranding.[25]

██ While the Coast Guard *"may* establish, maintain, and operate * * * aids to maritime navigation", 14 U.S.C. § 81 (emphasis added), once it has established such aids it *shall* maintain and operate them as provided under 14 U.S.C. § 2. No other person, public body, or instrumentality, excluding the armed service, may establish, erect, or maintain any such aid without Coast Guard authorization, 14 U.S.C. § 83, or remove, change the location of, obstruct, or otherwise interfere with any aid established, installed, operated or maintained pursuant to § 81. Title 14, United States Code, Section 84. Once the Coast Guard "exercised its discretion to * * * [establish a buoy at West Cod Ledge Rock] and engendered reliance on the guidance afforded by the * * * [buoy], it was obligated to use due care to make certain that the * * * [buoy] was kept in good working order." Indian Towing Co., Inc. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 127, 100 L.Ed. 48 (1955). If the buoy moved from its charted position, "the Coast Guard was further obligated to use due care to discover this fact and to * * * [restore it to its charted position] or give warning * * *." Indian Towing Co., Inc. v. United States, *supra* at 69, 76 S.Ct. at 127. Coast Guard Regulations require "[t]hat the commanding officer shall make every reasonable effort to observe and check the proper functioning of all aids to navigation within the range of his immediate area of operations. He shall inform the district commander by dispatch of any aid to navigation that is found to be *out of position* or out of order, including information as to any corrective action taken by him." C.G. 300 Par. 716; see C.F.R. Title 33 § 2.01-5. (Emphasis added.) Buoy No. 2 was 3.1 miles distant and visible from Portland Light Vessel and could have been checked either by a bearing or sextant angle, which would have revealed a 3-degree difference between the charted position and the actual position of the buoy as measured from the Light Vessel.[26] That Portland Light Vessel had responsibility to monitor Buoy No. 2 along with Cape Elizabeth Life Boat Station seems clear. Its "Aids to Navigation Operation Bill" directed that "[a]ll unattended aids to navigation, including floating aids, in the vicinity of the station shall be observed for failures or other irregularities." [27] See also First Coast Guard District Operations Plan—Annex K ¶ 3 and Appendix 1 to Annex K, (K-1-3, 4 and K-1-63).[28] The Aids to Navigation Monitoring Bill of Cape Elizabeth Life Boat Station required the taking of range and bearing of every aid within visual range of that station at fixed intervals, and Buoy No. 2 was one of the aids specifically listed with its bearing and range.[29] A bearing taken immediately following the stranding of NORTHERN GULF from the Life Boat Station showed that Buoy No. 2 was on a nearly correct bearing from it, but the Station's commanding officer admitted he could not determine whether the buoy was on its proper station from a single bearing, although he could have done so had he also had a bearing on the buoy from Portland Light Vessel with which he was in radio contact.[30]

24. Tr. 94.

25. Exhs. M, N, O, S, V, X, Y.

26. Exh. Y at 70–75.

27. Exh. BG.

28. Exhs. BA, BB.

29. Exh. BW.

30. Exh. N at 8, 15, 16–17.

The buoy tender COWSLIP had primary responsibility for monitoring Buoy No. 2 under the First Coast Guard District Operations Plan—Appendix 1 to Annex K (K–1–63).[31] She made regular logistic runs from South Portland to Portland Light Vessel, passing the buoy twice on each trip, and in fact passed it ten times between October 1, 1963 and the date of the stranding, the last time being in the morning of November 21, 1963.[32] There is no evidence that Buoy No. 2 was checked by COWSLIP by bearings or sextant angles, and if fathometer readings were taken, as claimed, the claimed readings would not have determined that the buoy was on its charted position.[33] In fact, the fathometer readings taken by the lobstermen in the spring of 1963 clearly indicated the buoy was off station and were the basis for their conclusions at that time.[34]

In addition to the duties imposed upon the Portland Light Vessel, Portland Life Boat Station and COWSLIP, similar duties were imposed on other Coast Guard vessels operating within range of their immediate area of operations.[35] The Coast Guard cutters ACUSHNET, BARATTARIA, COOS BAY and COOK INLET, based in Portland, regularly passed in and out of Portland Harbor, yet defendant failed to produce a single witness from these cutters who could say that the position of Buoy No. 2 had been checked by cross-bearings or sextant angles at any time after the spring of 1963 until after the stranding of NORTHERN GULF.[36]

■ It seems clear that, after Buoy No. 2 was reset by COWSLIP after breaking loose from its mooring in December 1962, the Coast Guard personnel who were responsible for checking its position failed to use the means readily available to make certain that it was on its charted position, or to discover that it was off its charted position. In view of the length of time during which it was off station, the continued surveillance of the immediate area by Coast Guard personnel, the distance it was off station, the available means of discovery, the obvious importance of the buoy, and the clear mandate of statute and regulations, defendant must be held to have had constructive notice, and its failure to act amounts to actionable negligence. Indian Towing Co., Inc. v. United States, *supra*; Russell, Poling & Co. v. Conners Standard Marine Corp., *supra;* Chesapeake & O. Ry. v. United States, 1964 A.M.C. 2651 (E.D.Mich.), *amended,* 1966 A.M.C. 1883 (E.D.Mich.1962) (not otherwise reported).

## LIABILITY OF NORTHERN GULF FOR NAVIGATIONAL ERRORS.

■ It is, of course, defendant's contention that it was not negligent in so far as the situation of Buoy No. 2 is concerned, and that even if such displacement occurred for any length of time prior to the stranding that would merely have been a condition and not a cause of the stranding. Crawford v. Indian Towing Co., Inc., 240 F.2d 308, 311 (5th Cir.), cert. denied, 353 U.S. 958, 77 S.Ct. 865, 1 L.Ed.2d 909 (1957); P. Dougherty Co. v. United States, 207 F.2d 626, 631–632 (3d Cir. 1953), cert. denied, 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068 (1954). In support of this proposition, defendant contends that the sole cause of the stranding of NORTHERN GULF was the improper navigation of that vessel by the pilot and crew. Of course, stranding on a well-known and fully-charted reef in itself raises a presumption of negligence and fault. However, liability is based on "fault", and the fault that is to produce liability must be not mere fault in the abstract, but fault that is a contributory cause of the stranding. Where a vessel has been guilty of a statutory fault, a drastic and unusual presumption arises under the so-

31. Exh. BB.

32. Exh. Y at 56–57; Exh. AK.

33. Exh. Y at 93; Exh. CC.

34. Exhs. 23, 24 and 27.

35. Exh. BB.

36. Exhs. J, K, L, M, T, W, X, Y.

called "Pennsylvania" rule, The Pennsylvania, 86 U.S. 125, 19 Wall. 125, 22 L.Ed. 148 (1873), whereunder the vessel thus cast in fault must prove, to escape liability, not only that the fault shown probably did not, but also that it *could not* have contributed to causing the accident. However, it is only statutory fault that invokes the "Pennsylvania" rule. A ship which is at fault in some other regard, that is, for example, guilty of negligence by general standards, still has the benefit of the usual rule placing the burden of proof of causal connection upon the one asserting negligence. Oriental Trading & Transp. Co., Ltd. v. Gulf Oil Corp., 173 F.2d 108, 110 (2d Cir.), cert. denied, Gulf Oil Corp. v. The John A. Brown, 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1728 (1949). In determining the existence of statutory fault, it is necessary to determine whether the particular statute alleged to have been violated is mandatory in form, or whether it is merely some evidence of a standard of care to be exercised in navigation. Home Shipping Co., S. A. v. United States, 239 F.Supp. 226, 230 (D.Del. 1965), aff'd, 359 F.2d 435 (3rd Cir.), cert. denied, 385 U.S. 930, 87 S.Ct. 289, 12 L.Ed.2d 212 (1966). Furthermore, we are not dealing here with a rule of navigation designed to prevent collision.

Defendant's contention is that NORTHERN GULF'S pilot navigated solely by "seaman's eye" and relied upon Buoy No. 2 being on its charted position rather than upon fixes from bearings on appropriate landmarks in the form of aids to navigation. There were several fixed landmarks, which were aids to navigation and visible to NORTHERN GULF'S pilot and navigators as she proceeded from the Portland Lightship to West Cod Ledge Buoy No. 2. Such aids to navigation were Cape Elizabeth (distant 5.3 miles from Portland Lightship and distant 3.1 miles from Buoy No. 2), Portland Head Lighthouse (distant 7.6 miles from the Lightship and

distant 4.6 miles from Buoy No. 2), Halfway Rock (distant 8.1 miles from the Lightship and distant 6.4 miles from Buoy No. 2) and Ram Island (distant 7.5 miles from the Lightship and distant 4.4 miles from Buoy No. 2).[37] Defendant contends that had the pilot taken fixes on two or more of the aforementioned landmarks he would have determined that his position based on a bearing on Buoy No. 2 as charted did not correspond with the fix and, accordingly, this would have indicated to him that the buoy was off station. For legal support of its position, defendant cites 33 C.F.R. § 62.25–55 which bears the title "Caution" and reads, in pertinent part, as follows:

"(a) Buoys are liable to be carried away, shifted, capsized, sunk, etc.; lighted buoys may be extinguished or sound buoys may not function as the result of storm, the accumulation of ice, running ice or other natural causes, collision or other accident.

"(b) For the foregoing reasons, mariners should not rely *completely* upon the position or operation of floating aids to navigation, but should *also* utilize bearings from fixed objects and aids to navigation on shore." (Emphasis added.)

Defendant also makes reference to the cautionary notes concerning aids to navigation contained in the Introduction to the List of Lights and Other Marine Aids—Atlantic Coast,[38] more specifically to the statement relative to Buoys at page X thereof, which reads, in pertinent part, as follows:

"It is imprudent for a navigator to rely on floating aids to navigation to always maintain their charted positions and to constantly and unerringly display their advertised characteristics. The obstacles to perfect performance are of such magnitude that complete reliability is manifestly impossible to achieve. Buoys are liable to be carried away, shifted, capsized, or sunk as the result of storms, ice con-

37. Affid. 12.

28. Exh. 17.

ditions, collisions, or other accident. Lighted buoys may become extinguished or their lighting apparatus broken or deranged causing them to show improper light colors or light phase characteristics. * * *

Buoys are moored to scopes of chain of various lengths, and in some cases several times the depth of the water in which they are located. Like the LIGHTSHIP, the radius of swing should be taken into account.

The position of a buoy, as shown on the chart, actually represents the location of its sinker to which the mooring chain is shackled. The buoy, however, does not maintain position directly over its sinker. * * *

*All buoys should, therefore, be regarded as warnings or guides and not as infallible navigation marks; especially those located in exposed positions. Whenever possible, a ship should be navigated by bearings or angles on fixed objects on shore and by soundings, rather than by reliance on buoys."* (Emphasis in original.)

Defendant also quotes from B. Dutton, Navigation and Nautical Astronomy 141 (6th ed. 1939), under the heading "Piloting": [39]

*"Buoys do not always maintain exact positions; therefore, they should always be regarded as warnings and not as fixed navigational marks, especially during the winter months or when moored in exposed waters. A vessel's position should, when possible, be plotted not by buoys, but by bearings or by angles of fixed objects on shore."*

Plaintiff, in turn, refers to the U. S. Coast Guard publication, "Buoys in Water of the United States" (1942), which was "prepared primarily for instruction work and is not intended to replace the Light Lists, Coast Pilots, and Charts dealing with the subject", and *refers to the first paragraph on page 2 of the publication under the heading "The Signifi-*

cance of Buoys", which reads as follows: [40]

"The primary function of buoys is to warn the mariner of some danger, some obstruction, or change in the contours of the sea bottom, and to delineate the channels leading to various points, that he may avoid the dangers and continue his course safely. *The utmost advantage is obtained from buoys when they are considered as marking definitely identified spots, for if a mariner knows his precise location at the moment and is properly equipped with charts, he can readily plot a safe course on which to proceed.* Such features as size, shape, coloring, numbering and signalling equipment of buoys, are but means to these ends of warning, guiding, and orienting." (Emphasis added.)

██ However, of the foregoing quoted authorities, only 33 C.F.R. § 62.25–55 has the force of law. 44 U.S.C. § 1301 *et seq.;* Rowe v. Brooks, 329 F.2d 35, 42 (4th Cir. 1964); Home Shipping Co., S. A., v. United States, *supra.* And even if the cautionary language can be considered a regulation, it can scarcely be construed as prohibiting or mandating any particular conduct sufficient to invoke the drastic "Pennsylvania" rule. In none of the authorities relied upon by defendant is the prudent navigator forbidden to rely on buoys—rather, he is cautioned not to rely on buoys alone where additional means of fixing his position are available. Indeed, there is authority for the proposition that pilots have the right to rely on buoys. The Clevelander, 83 F.2d 947, 949 (2d Cir. 1936); Trinidad Corp. v. S. S. Sister Katingo, 280 F.Supp. 976, 977 (S.D.N.Y. 1967); Chesapeake & O. Ry. Co. v. United States, *supra.* The cases cited by defendant are clearly distinguishable from the instant case, since they either involved a failure to use readily available ranges or range lights, or outages of light buoys which should have alerted the

---

39. Exh. 35A.

██

40. Exh. 30.

pilot to the fact that he was proceeding into danger.[41]

There were no ranges available to the pilot of NORTHERN GULF, certainly not on his course from the Lightship to the vicinity of Buoy No. 2.[42] The pilot had no reason to suspect that the buoy was off its charted position and knew that the buoy was in constant view of Coast Guard units who were required to check its position.[43] It was not unreasonable for him to expect that the Coast Guard would warn him if the buoy was off its charted position. As stated in Casement v. Brown, 148 U.S. 615, 627, 13 S.Ct. 672, 677, 37 L.Ed. 582 (1893):

> "[I]t would be placing too severe a condemnation on the conduct of the pilots in charge of the boats to say that their error of judgment, their dependence on the appearance of the stream, and *their reliance upon the duty of the defendants to place suitable buoys or other warnings,* was such contributory negligence as would relieve the defendants from liability for the results of their almost confessed, and certainly undoubted, negligence." (Emphasis added.)

NORTHERN GULF'S pilot had received no reports from any source warning him that Buoy No. 2 was off its charted position, nor was there any weather for a period of at least two months prior to the stranding which would have affected the position of the buoy.[44]

■ Defendant's contention that the fact that the buoy was off its charted position was merely a condition and not the cause of the stranding is without merit. It seems abundantly clear that if the buoy had been on its charted position NORTHERN GULF would have passed 350–400 yards to the west of her stranded position in 80–90 feet of water and well clear of West Cod Ledge Rock. The fault of the Coast Guard in failing to maintain Buoy No. 2 on its charted position is established as the sole proximate cause of the stranding of NORTHERN GULF. As was stated in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84 (1893):

> "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the

41. Standard Dredging Corp. v. S. S. Syra, 1968 A.M.C. 2235, 2239 (D.Md.1968) [not otherwise reported] (Radio and written notice of relocation of buoy given. Master did not determine his position by reference to range lights, "which are recognized as the most reliable means of ascertaining one's position"); Philadelphia Elec. Co. v. Curtis Bay Towing Co., 260 F.Supp. 505 (E.D.Pa.1966), aff'd, 390 F.2d 125 (3rd Cir. 1968) (Two fixed range lights maintained by Coast Guard on markers visible in daytime to show navigator his course. Buoy 225 feet off station in channel 1,000 feet wide. Pilot took no bearing on or observation of buoy before stranding); Canada S. S. Lines, Ltd. v. Great Lakes Dredge & Dock Co., 81 F.2d 100 (7th Cir. 1936) (Failure to use government range lights); The Manhattan, 3 F.Supp. 75 (E.D.Pa.1932), aff'd per curiam, 63 F.2d 995 (3rd Cir. 1933) (Failure to follow the ranges); The Miles Standish, 1928 A.M.C.

215, 216 (S.D.N.Y.1919) [not otherwise reported] (The Channel was "known, not only by buoys, but by courses or ranges which would serve to correct the position of the buoys"); The Somers N. Smith, 120 F. 569 (D.Me.1903) (Failure to follow rangeway in narrow channel); The Bella Dan, 1968 A.M.C. 900, 908 (4th Cir. 1968) [not otherwise reported] (Failure to post lookout "who could have observed the *Bella Dan's* divergence from the line of channel buoys"). See also Dibble v. United States, 1968 A.M.C. 1557 (N.D.Ill.1968) [not otherwise reported] (Failure to use range lights); United States v. Sigfridson, 1964 A.M.C. 2341 (D.Ore.1963) (Failure to use range lights).

42. Tr. 94, 261; Exh. 29.

43. Exhs. BA, BB, BG, BW; Tr. 78–79, 163.

44. Affid. 10; Exh. 3; Tr. 80.

conduct of such other vessel should be resolved in its favor."

Defendant's attempt to show that navigational errors on the part of NORTHERN GULF'S pilot contributed to the stranding, while understandable, cannot withstand careful analysis.[45] It is apparent that if Buoy No. 2 had been on its charted position NORTHERN GULF'S course change would not have started until she was one-quarter mile farther to the northwest and she then would have passed clear of West Cod Ledge. There is no evidence to support an argument that the pilot was, or should have been, aware that he was proceeding into danger. Even if cross-bearings or radar ranges had been taken and plotted by those on NORTHERN GULF while proceeding on the 315-degree course, they would have shown that NORTHERN GULF was on a safe course to pass clear of West Cod Ledge Rock. The swing of the ship after the course change was started at Buoy No. 2 and the short period of time after she steadied up on her new course precluded a running fix of the vessel's position in time to avoid the stranding. Nor does it appear likely that the pilot, had he been able to obtain a running fix, would have had the opportunity, in view of the time the vessel required to answer the helm, to avoid the imminent danger. Moreover, defendant's contention that the pilot should have made continual fixes of his position should be viewed in the light of its statement in its reply brief directed, of course, to the clearly established failure of defendant to fix the position of Buoy No. 2. According to defendant, to do what it would have the pilot of NORTH-ERN GULF do would obviously be impractical so far as the Coast Guard was concerned.[46]

The vessel was adequately fitted out with charts, publications, and navigation instruments. There is no evidence that the master, crew or compulsory pilot were incompetent or that the master should have interfered with the pilot's navigation. Even if a running fix might have alerted the pilot that the buoy was off position in time for effective action to have been taken, we are cautioned by the Supreme Court against judgment by sternsight:

"Whether she [the innocent ship] may not have been slightly in fault, may be a close question. This is often so when *subsequent* knowledge of what might have prevented disaster tends to qualify the inquiry as to the prior duty to avert it." The Victory & The Plymothian, 168 U.S. 410, 424, 18 S.Ct. 149, 155, 42 L.Ed. 519 (1897). (Emphasis added.)

Accordingly, I find the defendant solely liable for the stranding of NORTH-ERN GULF and the resultant damages. Submit proposed findings of fact and conclusions of law in conformity herewith, including such findings of fact as have already been agreed upon. An interlocutory judgment will thereafter be entered, and the parties thereafter will be given sixty (60) days to agree upon the damages properly to be awarded or, failing such agreement, that issue will be set down for trial or, upon a proper showing as required by Rule 53(b) of the Federal Rules of Civil Procedure, the determination of damages will be referred to a Special Master.[47]

---

45. A finding of contributory negligence, however slight, on the part of plaintiff would result in the imposition of equal liability and, in effect reduce defendant's liability by one-half. Dwyer Oil Transport Co., Inc. v. The Edna M. Matton, 255 F.2d 380 (2d Cir.), cert. denied, 358 U.S. 838, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958); Russell, Poling & Co. v. United States, 140 F.Supp. 890 (S.D.N.Y.1956).

46. Defendant's Reply Brief at 6.

47. See Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania de Vapores, S.A., 388 F.2d 434, 440 (2d Cir.), cert. denied, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968).