**INTER–CITIES NAVIGATION
CORPORATION, Appellee,**

v.

**UNITED STATES of America,
Appellant.**

**No. 77–1798.**

United States Court of Appeals,
Fifth Circuit.

Dec. 28, 1979.

Rehearing Denied Feb. 20, 1980.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Emmett B. Lewis, Atty., William G. Kanter, Atty., Barbara Allen Babcock, Asst. Atty. Gen., Morton Hollander, Atty., U. S. Dept. of Justice, Washington, D. C., for appellant.

Nathaniel G. W. Pieper, Tampa, Fla., for appellee.

Before BROWN, CHARLES CLARK and VANCE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This appeal concerns an untoward turn on the St. John's River at which we turn to the problem of causation. We must decide whether the United States may be held liable for a ship-to-pier collision merely because the Government failed to keep a certain buoy on its charted position, even when there is virtually no evidence that the navigator relied on the charted position in making his turn. We relieve the Government of all responsibility, overturning the District Court's award of one third damages against the United States.

### An Untoward Turn—"We've done bought that pier."

On a clear day on September 17, 1972, the tug NAVIGATOR and the barge OCEAN CITIES failed to navigate successfully the Chaseville Turn in the Trout River Cut Range on the St. John's River. The Turn is marked by a Coast Guard buoy, number 69, to show a shoal on the left ascending side of the river. Although the vessel had made the turn on numerous occasions before without mishap, this time the vessel collided with a structure on the right side of the channel, the Shell Oil Pier, causing $483,872.47 in damages.

The tug and barge operate as a unit, the bow of the tug fitting into a notch in the stern of the barge. Together they extend 647 feet in length and 85 feet in beam. At the time of the collision the vessel had a draft of 32'6" forward and 31'6" aft, the deepest the vessel had ever been loaded. The tide was flooding at 2 to 2.5 knots.

On our turn-marred voyage, Captain Giles gave the helm over to his mate, John Rakyta, when the vessel was two thirds along the channel, five minutes before the collision. When the bow of the vessel reached Buoy 69, Rakyta put his rudder left in order to turn the vessel. The vessel did not respond. Rakyta then reversed his port engine in an effort to twist the vessel away from the pier and accelerate the turn. Captain Giles, relaxing at the stern of the vessel, saw Buoy 69 pass the tug and, unwittingly predicting the outcome of this litigation, remarked, "John, we've done bought that pier." [1] For, despite the efforts to turn and stop the vessel, it collided with Shell Pier.

Inter-Cities Navigation Corporation, the owner of the vessel, brought suit in the Middle District of Florida against the United States alleging that the Coast Guard failed to maintain Buoy 69 on its charted position. [2] Inter-Cities claimed that it was

---

1. Captain Giles testified at trial, "I was standing there smoking a cigarette and looking out the stern, down on the stern and I noticed all at once a buoy [number 69] come in my vision, and something dawned on me right at the present, right at that time that something was wrong, here. . . . I realized that we wasn't going to make the turn—the barge was swinging a little bit but I knew we wasn't going to make that turn without hitting that pier, and I told My. Rakyta that we had done bought that pier. . . .

2. Apparently, Inter-Cities settled its dispute with the pier owner prior to bringing this suit for indemnity against the Government.

entitled to rely upon the charted location, it did in fact rely on the charted location, the buoy was off station from its charted position, and this dislocation caused the collision.[3]

■ The District Court found the argument of Inter-Cities one third correct. The Court, conscious that when a moving vessel collides with a stationary object, such as a pier, there is a presumption that the moving vessel is at fault, *The Oregon*, 1895, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943, 949; *Skidmore v. Grueninger*, 5 Cir., 1975, 506 F.2d 716, 721, 1976 AMC 1103, 1110; *Petition of United States*, 5 Cir., 1970, 425 F.2d 991, 993, 1970 AMC 2034, 2038; *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 5 Cir., 1967, 377 F.2d 724, 726, 1967 AMC 2684, 2687, found that Inter-Cities did not overcome this presumption. Yet the Court also found that the buoy was off station by 400 to 600 feet on the date of the collision and declared the Coast Guard could and should have detected and corrected this upstream position. Without much more ado, the District Court concluded that the off station buoy helped cause the collision and thereupon cast the United States for one third damages. The Government appealed.

### Lack Of Causation Turns Around The Result

In this Court the Government denies that it had any responsibility for the collision. The United States maintains, and we must agree, that the dislocation of the buoy was not a contributory cause of the collision since Rakyta did not rely upon the charted position of buoy 69 in making his turn.

■ A finding of causation is highly specific to the circumstances, often articulated by a dazzle of language riding the tide only to shift with the current and case. In a maritime collision, as for any tortious injury, an act or omission must have a reasonable connection in fact with a collision in order to find contributory fault on the part of the actor or omittor. Gilmore & Black, The Law of Admiralty § 7–5 (2d ed. 1975); W. Prosser, The Law of Torts § 41 (4th ed. 1971). As we have often stated, "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Board of Commissioners of Port of New Orleans v. M/V FARMSUM*, 5 Cir., 1978, 574 F.2d 289, 297, 1978 AMC 856; Gilmore & Black, The Law of Admiralty § 7–5, at 494 (2d ed. 1975). Where two or more actors combine to contribute to the collision, each need not be the sole cause, but only a substantial and material factor in causing the collision. W. Prosser, The Law of Torts § 41, at 240 (4th ed. 1971).

However, a failure to act, even though unreasonable, cannot contribute to cause a collision where the action would not have affected its occurrence. Thus, in one early case, the Supreme Court held that the absence of a lookout could not cause a collision of a ship with a pier when the pier was in plain sight. *Clark v. The Steamer Admiral Farragut*, 1870, 77 U.S. (10 Wall.) 334, 19 L.Ed. 946. There, the Court emphasized, "it would be against all reason to contend that the master or owners of a vessel should be made liable for the consequences of an accident by reason of not having a special lookout where the collision or loss could not have been guarded against by a lookout, or where it is clear that the absence of a lookout had nothing in causing it." 47 U.S. at 338, 19 L.Ed. at 947. We have repeatedly, unswervingly followed this principle. *Board of Commissioners of Port of New Orleans v. M/V FARMSUM, supra* (failure to signal and reject agreed passing arrangement not contributory fault in ship collision); *Chotin Transportation, Inc. v. M/V HUGH C. BLASKE*, E.D.La., 1972, 356 F.Supp. 388, *aff'd*, 5 Cir., 1973, 475 F.2d 1370 (absence of lookout not a contributory cause in tow collision); *China Union Lines,*

---

**3.** While the District Court found the buoy to be between 400 and 600 feet off station, Captain Giles testified at trial that the vessel needed only 200 more feet to make the turn successful-

ly. Rakyta testified that the vessel would have stopped before the pier if there had been only 100 additional feet.

*Ltd. v. A. O. Andersen & Co.*, 1966, 364 F.2d 769, 780–84, 1966 AMC 1653, 1667–72, *cert. denied*, 1967, 386 U.S. 999, 87 S.Ct. 1301, 18 L.Ed.2d 353 (absence of lookout and anchor watch not contributory causes); *Atkins v. Lorentzen*, 5 Cir., 1964, 328 F.2d 66, 1964 AMC 2331 (absence of bow lookout and failure to effect engine maneuvers not contributory cause of ship collision); *Ellis Towing & Transportation Co. v. Socony Mobil Oil Co.*, 5 Cir., 1961, 292 F.2d 91, 96, 1961 AMC 1406, 1412 ("A ship may be negligent for failure to have a proper, vigilant lookout and yet not be held at fault where, for example, what the lookout would have learned was already known." (citations omitted) ).

■ By the same token, in order for an improperly placed navigational aid, such as a buoy, to be deemed a contributory cause of a collision, the position of the aid must reasonably affect the intended navigation. This causal connection is explained as a requirement of reliance. The Supreme Court has emphasized the need for reliance in finding causation. In ruling on the scope of government liability under the Federal Tort Claims Act, the Court admonished,

> The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light . . . and *engendered reliance* on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

*Indian Towing Co. v. United States*, 1955, 350 U.S. 61, 69, 76 S.Ct. 122, 127, 100 L.Ed. 48, 56, 1955 AMC 2406 (emphasis added). The First Circuit has underscored the reliance requirement of *Indian Towing*. In *United States v. Sandra & Dennis Fishing Corp.*, 1 Cir., 372 F.2d 189, *cert. denied*, 1967, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98, the First Circuit ruled that the Coast Guard induced plaintiff's reliance that its towing boat would reasonably perform its

task, plaintiff did rely, and the Coast Guard's failure to properly tow plaintiff helped cause the sinking of plaintiff's vessel. The Court explained that *Indian Towing* imposed liability not merely because the Coast Guard maintained inadequate navigational equipment but because the Coast Guard "failed to maintain a particular aid after the plaintiff had been led to believe that it could rely on it." *Id.* at 195.

■ The question of reliance involves primarily factual matters, reversible only if the District Court findings are clearly erroneous. F.R.Civ.P. 52(a); *D/S Ove Skou v. Hebert*, 5 Cir., 1966, 365 F.2d 341, 346, 1966 AMC 2223, 2228–29. On appeal a reviewing court may not weigh the evidence *de novo* or disturb a finding simply because it might have reached a different result. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 1969, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148. Nonetheless, there is clear error when, although there is evidence to support a finding, a reviewing court is firmly convinced that a mistake has been made. *United States v. Gypsum Co.*, 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 541–542, 92 L.Ed. 746, 766.

■ In our case, the District Court found that buoy 69 was off station on the date of the accident, the buoy had a history of moving off station, and the Coast Guard was negligent in failing to detect and correct this dislocation. These findings are supported by the record. The Court then determined the consequences of the buoy's being off station. The shipowner claims the Court found that Rakyta knew the on station position of the buoy. But the actual finding was much less. The Court found "Because the buoy was 400 odd feet upstream from its charted position, Rakyta started his turn 400 feet further upstream, or *later*, than he supposed." (Court's emphasis.) The Court concluded that the fact that the buoy was off station contributed to cause the collision.

There is not an adequate basis for the District Court to find that Rakyta relied on the buoy, as charted, in making his turn. A careful reading of the record shows that

there was no credible evidence that Rakyta knew of the correct charted position of the buoy or that operationally this had anything to do with his navigation. The only suggestion that Rakyta knew of the charted position before the collision was his own single sentence statement, elicited at the behest of the District Court, that Rakyta "knew where on the chart 69 was." To the contrary, Rakyta did not know the correct distance of the buoy from the pier. Nor did he learn of the correct position of the buoy or distance to the pier by prior experience since every time that he had made the turn before the buoy had been off station. Moreover, he repeatedly testified that he steered the vessel by reference to the actual off station position of the buoy, not by some invisible grid in his mind.[4] Yet, the evidence indicated that a prudent navigator would commence his turn well before buoy 69, even when the buoy is on station. Nor was there any evidence that the chart was aboard the vessel on this voyage or ever had been. On this record, lacking in any substantial evidence that Rakyta knew or in any way relied on the buoy's charted position in navigating the ship, we must conclude that the dislocation of the buoy was not a cause in fact of the collision and the Government was not, therefore, liable.

Rather, the factual as well as legal cause of the collision seems to rest squarely with Inter-Cities. The evidence showed that the vessel did not respond well to the mate's attempts at turning. Rakyta testified that the vessel did not initially react when he pulled his rudder left. At this failure to respond, he put the port engine full astern. The vessel still failed to fully turn. Moreover, the record indicates that the vessel was loaded more heavily than it had been on previous voyages up the river. Rakyta testified that he had sailed the St. John's River at least twenty times before, three or four times with the tug and barge, but

never before with such a heavy draft. On all prior voyages the draft of the vessel had been only 20 to 22 feet, while on this trip the draft reached 31'6" forward and 32'6" aft. While the District Court specifically found that the vessel was not "overloaded," the evidence indicated that the barge and tug handled "sluggishly" when loaded to a draft of 31 to 33 feet. Indeed, there was even testimony that shortly after the accident Captain Giles told his superiors that the barge was loaded too deeply, and that the rudder power to the tug was insufficient to handle the barge so laden. Bearing on the probabilities which inhere in our conclusion that the trial court's finding produced a serious mistake, we are also not unmindful of the evidence, albeit not conclusive, that in the three years when the buoy was off station, 5000 vessels had successfully completed the Chaseville Turn without hitting the pier, all with the buoy off its charted position.

Although we do not condone the Government's practice of failing to keep buoy 69 on station or its chart up to date,[5] we hold that this failure did not contribute to cause the collision. We overturn the District Court's finding of partial liability on the part of the United States and return the full responsibility for the collision to Inter-Cities.

REVERSED.

4. Rakyta testified, "I was steering by reference to the buoys that were on the river" and "the buoy showed me where the start of the turn was." The following colloquy suggest the same use by Rakyta of the buoy: "THE COURT: . . . you spotted Buoy 69 did you? THE WITNESS: Yes, sir. THE COURT: Is that where you were going to make your turn? THE WITNESS: Yes, sir."

5. See *De Bardeleben Marine Corp. v. United States*, 5 Cir., 1971, 451 F.2d 140.