**WHITNEY STEAMSHIP COMPANY, as
Owner of the M/V SAM LAUD,
Plaintiff-Appellee Cross-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellant
Cross-Appellee.**

Nos. 799, 837, Dockets 83–6133, 83–6147.

United States Court of Appeals,
Second Circuit.

Argued March 9, 1984.

Decided Oct. 16, 1984.

Tenney, Senior District Judge, sitting
by designation, filed a dissenting opinion.

Janis G. Schulmeisters, U.S. Dept. of Justice, New York City (J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., and Roger P. Williams, U.S. Atty., Buffalo, N.Y., on the brief), for defendant-appellant cross-appellee.

Fenton F. Harrison, Buffalo, N.Y. (Harrison & Gruber, Buffalo, N.Y., on the brief) for plaintiff-appellee cross-appellant.

Before TIMBERS and CARDAMONE, Circuit Judges, and TENNEY, Senior District Judge, Southern District of New York, sitting by designation.

TIMBERS, Circuit Judge:

More than a decade and a half ago, then Chief Judge Aldrich of the First Circuit stated that his Court refused to be a party to adding to the Coast Guard's honored motto, "Semper Paratus" (Always Ready), the words "Interdum Prudens" (Sometimes Careful). *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 197 (1 Cir.), *cert. denied*, 389 U.S. 836 (1967). That is the touchstone of the instant case so far as the principal appeal is concerned in which the United States seeks total exoneration for the conduct of the Coast Guard in this saga on Lake Erie outside Buffalo Harbor on July 4, 1976.

Before us are cross-appeals from a judgment entered March 25, 1983, in an admiralty action in the Western District of New York, Edmund F. Maxwell, *Magistrate.* The M/V SAM LAUD twice ran aground on July 4, 1976. The Buffalo Traffic Buoy, maintained by the United States Coast Guard, was not on station at the time of the groundings. Whitney Steamship Company, owner of the SAM LAUD, commenced this action for damages, alleging that the groundings were due to the negligence of the Coast Guard by reason of the absence of the buoy.

The action was tried before Magistrate Maxwell pursuant to 28 U.S.C. § 636(c) (1982) and Rule 36(B) of the Rules of the Western District of New York, the parties having waived their right to a trial before a district judge and having consented to a trial before a magistrate. The Magistrate found that, although the vessel's negligence was the primary cause of the groundings and that they could have been avoided even though the buoy was off station, the groundings nevertheless would not have occurred if the buoy had been in place and that the Coast Guard was negligent in failing to discover the buoy's absence. The Magistrate apportioned 80% of the damage to Whitney Steamship and 20% to the United States. The parties thereafter stipulated that the total damage sustained was $1,204,915.89. Judgment was entered on March 25, 1983, awarding $240,-908.16, or 20% of the total damage, against the United States.

From that judgment, the United States has appealed and Whitney Steamship has cross-appealed. Finding no error, we affirm.

I.

At the time of the groundings, the SAM LAUD was carrying a load of iron ore pellets from Taconite Harbor, Minnesota, to Buffalo, New York, under the command of Captain Albert Wilhelmy, an experienced lake captain. The Third Mate, Alexander McDonald, although an experienced mariner, was making his first trip as an officer licensed by the Coast Guard. The SAM LAUD was equipped with fully functional gyro and magnetic compasses, with equipment for taking visual bearings on shore objects which then could be plotted on a

navigational chart to ascertain the vessel's position, and with two marine radars.

McDonald took over the navigation or "con" of the SAM LAUD at 0745 hours on the morning of July 4, 1976. She was then about 9 miles from Long Point, Ontario, and 60 miles west of Buffalo, running at full speed—approximately fifteen and a half miles per hour—in heavy fog. McDonald previously had been instructed by Wilhelmy to pursue a course recommended by the Lake Carriers Association, an organization of lake ship owners. The Association recommends certain courses for the purpose of separating upbound and downbound lake traffic, and the limits of these courses are clearly marked on harbor charts. McDonald was supposed to follow the course from Long Point, Ontario, to the Buffalo Traffic Buoy.

The buoy in question is designated in the 1976 U.S. Coast Guard Light List as the "Buffalo Harbor Traffic Lighted Bell Buoy" No. 400 and is identified in the charts as "(BW) Bell Mo (A) W". We shall refer to it as the "Buffalo Traffic Buoy" or "the buoy" in this opinion. The buoy is black and white vertically striped, 6 feet in diameter and 20 feet in height. It extends 10 feet above the water. It is equipped with a light and radar reflector. It is moored in approximately 40 feet of water and marks the point at which downbound vessels must change their course depending on which entrance to Buffalo Harbor they wish to use. It is removed from its station during the winter months, but had been returned to its station on April 26, 1976.

Using the vessel's radar, McDonald took bearings on Long Point at 0756 hours which indicated that the vessel was "roughly a half mile wide" of the recommended lake course line. He changed course from 71 to 62 degrees, the recommended course line from Long Point to the Buffalo Traffic Buoy.

The SAM LAUD broke out of fog just west of Point Abino. Thereafter visibility was excellent, the winds were light and fixed landmarks were readily visible. Un-der the prevailing weather conditions, the buoy should have been visible to the pilot of the SAM LAUD from a distance of at least four miles. This is in accordance with the Coast Guard Light List which states that a buoy extending 10 feet above the water should be visible to an observer at water level for a distance of approximately 4 miles. Since the pilot house is significantly above water level, the buoy should have been visible from more than four miles. There was testimony that the buoy should have been visible for seven to eight miles.

McDonald and the wheelsman tried to locate the buoy with binoculars and radar, but the buoy was not sighted. McDonald called Wilhelmy and told him that he had been unable to locate the buoy. Wilhelmy came to the pilot house briefly and instructed McDonald "to head on the buoy when he saw the buoy." No plots of the vessel's location were made on any chart from the time she passed Point Abino. There is no legal requirement that vessels plot their positions on navigational charts, but it is considered good navigation practice to do so.

At 1120 hours, McDonald logged the SAM LAUD's position as 3.2 miles off Point Abino, proceeding at full speed. To steer on the charted position of the Buffalo Traffic Buoy, a starboard turn was necessary at this time. But the log shows that the course was changed to 60 degrees, thus turning the vessel to port. McDonald and the wheelsman continued to search for the buoy, but without success. They continued these efforts until relieved.

At approximately 1140 hours, Wilhelmy returned to the pilot house and assumed control. McDonald informed him that the Buffalo Traffic Buoy had not been sighted. No change was made in the vessel's course or speed. By this time, the vessel was far off the limits of the recommended downbound course that Wilhelmy had intended to follow and in dangerously shallow water. At 1150 hours, the Second Assistant Engineer made a notation in the engine room log of a grounding. This grounding

was not noticed in the pilot house. An inspection disclosed that the vessel was holed and was taking on water in the forepeak.

Wilhelmy decided that the vessel was too far to the north; so he changed course to starboard and checked the engines to one-half speed shortly after the first grounding. The pilot house log reflects that speed was checked at 1148 hours (the course change was not recorded), but there is some inaccuracy in at least one of the log entries. Although the pilot house log shows that speed was checked at 1148 and the engine room noted the grounding at 1150, uncontradicted testimony showed that the first grounding occurred prior to checking the speed. A second grounding occurred which was felt in both the pilot house and the engine room. The pilot house log recorded this grounding at 1200; the engineer's log recorded it at 1201. Thereafter the vessel entered the harbor and docked.

The Coast Guard conducted a search for the Buffalo Traffic Buoy after the groundings. Neither the buoy nor its mooring chains ever were found.

There of course was a great deal of other evidence, but that summarized above is believed sufficient to an understanding of the legal issues upon which we rule below in this opinion.

The case was tried from May 12–15, 1981, and on June 10, 1981. The Magistrate filed his decision on September 1, 1982, concluding as we have stated above. He found, among other things, that the vessel had ample time to take corrective action after it would have become obvious to a reasonable person that the buoy was missing. Navigational landmarks other than the Buffalo Traffic Buoy were visible to persons on the vessel's bridge for at least half an hour prior to the groundings. If the vessel's position had been plotted on the navigational chart at any time until immediately before the accident, the course misdirection would have been obvious and the groundings could have been avoided. Nevertheless, the vessel continued to proceed at full speed while a search continued for the buoy. Accordingly, the Magistrate apportioned 80% of the fault to the vessel. He apportioned the remaining 20% of the fault to the Coast Guard. While he found that the accident could have been avoided if the vessel's navigators had exercised reasonable care, he nevertheless held that the Coast Guard should not be exonerated from all liability for the groundings, since its negligence was a contributing factor.

Thus the issue is squarely presented for our decision on the cross-appeals.

## II.

Reliance is an essential element in a case for damages against the Coast Guard. Although a forceful argument may be made to the contrary, we are convinced that the Magistrate did not err in implicitly finding that the vessel's initial reliance on the presence and location of the Buffalo Traffic Buoy was reasonable. The Magistrate found that the buoy was the major navigational aid in the harbor. The evidence showed that the Coast Guard was aware that mariners routinely relied on its presence. In *Indian Towing Co., Inc. v. United States*, 350 U.S. 61 (1955), the Supreme Court held that, once the government exercises its discretion to operate navigational aids and engenders reliance on the guidance afforded by such aids, it thereafter is obliged to make certain that they remain in good working condition.

The United States argues that the Coast Guard did not engender reliance on the Buffalo Traffic Buoy and points to new language on their charts and the Light List to the effect that the buoy "must not" be relied upon exclusively in navigating the harbor. The approach chart to Buffalo sets forth the following statement in distinctive magenta coloring: "WARNING The prudent mariner will not rely solely on any single aid to navigation, particularly on floating aids, see U.S. Coast Guard Light List and U.S. Coast Pilot for details." The Light List contains a more detailed warning:

"BUOYS It is imprudent for a navigator to rely on floating aids to navigation to always maintain their charted positions and to constantly and unerringly display their advertised characteristics . . . . The approximate position is used because of practical limitations in positioning and maintaining buoys and their sinkers in precise geographical locations. These limitations include, but are not limited to, inherent imprecisions in position fixing methods, prevailing atmospheric and sea conditions, the slope of and the material making up the seabed, the fact that buoys are moored to sinkers by varying lengths of chain, and the fact that buoy/body and/or sinker positions are not under continuous surveillance but are normally checked only during periodic maintenance visits which often occur more than a year apart . . . . The mariner is also cautioned that buoys are liable to be carried away, shifted, capsized, sunk, etc. ... For the foregoing reasons, a prudent mariner must not rely completely upon the position or operation of floating aids to navigation, but will also utilize bearings from fixed objects and aids to navigation on shore . . . . All buoys should, therefore, be regarded as warnings or guides and not as infallible navigation marks; especially those located in exposed positions."

A similar warning is found in 33 C.F.R. § 62.25–55 (1983).

These warnings of course increase the magnitude of the error of the SAM LAUD's navigators in failing to use other navigational aids. They do not convince us, however, that *any* reliance on the proper placement of the buoy was unreasonable. *Cf. Afran Transport Co. v. United States*, 435 F.2d 213, 219 (2 Cir.1970), *cert. denied*, 404 U.S. 872 (1971) ("What this amounts to is giving the Regulation an interpretation which construes the statement which only says mariners should not rely 'completely' on buoys in such a way as to say that mariners should not rely on buoys at all if they are able to take fixes. That such an innovation would be impractical and unenforceable seems apparent.")

Once a navigational aid is put in place, the Coast Guard is under a duty to exercise due care in maintaining it. Warnings will not immunize the Coast Guard from this duty, nor from the consequences of negligent maintenance which contributes to accidents.

The Magistrate also relied on the holding in *Afran Transport, supra,* 435 F.2d at 215, that, absent "some suspicious circumstance or notice, navigators are entitled to rely upon the representations made in the Government charts relative to the location of the buoys." True, suspicious circumstances began to appear as the SAM LAUD went further and further off course and the navigators' continued reliance on sighting the buoy until the very end was unreasonable. Nevertheless, these things occurred well after Wilhelmy's initial decision to steer a course toward the buoy. The Coast Guard may be held liable for damages if it is negligent in maintaining a navigational aid and such negligence causes an accident, even if circumstances finally make it obvious that the aid is missing or off station before the accident occurs. In *Reliable Transfer Co., Inc. v. United States,* 497 F.2d 1036 (2 Cir.1974), *reversed on other grounds,* 421 U.S. 397 (1975), we affirmed a damage award against the United States where the ship's captain discovered that the Coast Guard breakwater light was out a half hour prior to the accident and ceased to rely upon the light. On remand from the Supreme Court's holding in *Reliable Transfer,* 421 U.S. 397, 401–11, replacing the century old admiralty rule of equally divided damages by the rule of damages in proportion to fault, we remanded the case to the district court with instructions to enter judgment awarding damages on the basis of its finding that the stranding was caused 25% by the negligence of the Coast Guard in its failure properly to maintain the breakwater light and 75% by the negligence of the vessel in making a U-turn in a dangerous channel when her captain knew that the breakwater light was not operating. *Reliable*

*Transfer Co., Inc. v. United States,* 522 F.2d 1381 (2 Cir.1975).

■■■ We hold that the SAM LAUD's reliance on the buoy was justified. We turn now to the question of due care. The Coast Guard has a duty to exercise due care to discover if a buoy is misplaced or lost and to give warning as to its absence. *Indian Towing, supra,* 350 U.S. at 69. We believe that the Magistrate's determination that the Coast Guard was negligent in failing to warn mariners of the buoy's absence was not clearly erroneous. At 1849 hours on July 2, 1976, two days before the groundings of the SAM LAUD, the JOAN M. McCULLOUGH had reported to the Coast Guard that a buoy was missing. The report referred to the "Waverly Shoal traffic buoy" or "Waverly Shoal fairway buoy" as the missing buoy. The Coast Guard checked the buoy designated in the Light List as the "Waverly Shoal Buoy", a black can owned by the Canadian government, located approximately 2 miles north-north-west of the Buffalo Traffic Buoy in approximately eighteen feet of water. This buoy was found to be properly on station. The Magistrate found that the technically incorrect name "Waverly Shoal" is commonly used in referring to the Buffalo Traffic Buoy, and that the Coast Guard should have been aware that the McCULLOUGH was referring to it.

Many of the seamen who testified at trial continued to refer to the Buffalo Traffic Buoy as the Waverly Shoal Buoy. Prior to 1961, the buoy we refer to as the Buffalo Traffic Buoy was the primary navigational aid used in entering the Port of Buffalo. It was listed as the "Buffalo Harbor Waverly Shoal Lighted Bell Buoy", and commonly was referred to as the "Waverly Shoal Buoy." This buoy was moved approximately .9 miles southwest of its former position to its current location and was renamed when the approaches to the north and south harbor were changed in 1961. Evidently, experienced mariners continue to refer to this buoy as the "Waverly Shoal Approach Buoy" or the "Waverly Shoal Traffic Buoy." The terms "fairway" and "traffic" connote navigational buoys rather than warning or marker buoys like the one at Waverly Shoal.

The Magistrate also found that the described location of the missing buoy should have alerted the Coast Guard to the fact that the McCULLOUGH was referring to the Buffalo Traffic Buoy rather than the Waverly Shoal Buoy, because such a large vessel would not have been in the vicinity of the true Waverly Shoal Buoy. It is undisputed that between July 2 (when the McCULLOUGH reported that a buoy was missing) and July 4 (when the SAM LAUD was grounded) the Coast Guard issued no notices to mariners and broadcast no advisories regarding the Buffalo Traffic Buoy. It is further undisputed that the SAM LAUD monitored appropriate radio channels en route and picked up current notices to mariners on July 3. Since the Coast Guard negligently checked the wrong buoy, it did not discover that the Buffalo Traffic Buoy was off station and therefore issued no warnings.

The Magistrate found that this breach of the duty of due care by the Coast Guard was a proximate cause of the groundings. If "the buoy had been on station the vessel would have changed course to steer on the buoy and the groundings would not have occurred." This factual determination that the groundings would not have occurred but for the Coast Guard's error is entitled to substantial deference by us as a reviewing court. After all, the Magistrate heard and saw the witnesses. He was there and we were not.

■■■ The United States argues that it should not be held liable because the Magistrate found that the SAM LAUD could have avoided the groundings by using proper navigation procedures, even though the buoy was off station. This argument is essentially an invitation to return to the last clear chance doctrine, which negates a defendant's negligence if the plaintiff had the last opportunity to avoid the accident. We decline the invitation. Last clear chance is no longer viable in determining admiralty damages. *United States v. Reli-*

*able Transfer Co., Inc.,* 421 U.S. 397, 411 (1975); *see Getty Oil Co., Inc. v. SS Ponce De Leon,* 555 F.2d 328, 333 (2 Cir. 1977). The United States may incur liability for the Coast Guard's negligent failure to maintain a buoy if that failure is a factor contributing to the grounding of a vessel. *Bouchard Transportation Co., Inc. v. Moran Towing & Transportation Co., Inc.,* 428 F.Supp. 153, 155 (S.D.N.Y.1977).

If the Coast Guard had not been negligent in failing to discover the buoy's absence, of course it would not be liable. Courts have rejected any idea that strict liability applies with respect to the placing of navigational aids. *E.g., Indian Towing Co. v. United States,* 276 F.2d 300, 302 (5 Cir.), *cert. denied,* 364 U.S. 821 (1960).

This brings us, finally, to Whitney Steamship's cross-appeal in which it is asserted that the Magistrate apportioned damages on the basis of the degree of causation rather than the degree of fault. We disagree. Our review of the Magistrate's decision leads us to the conclusion that he properly carried out his responsibility of allocating damages in proportion to the fault of each party under *Reliable Transfer, supra,* 421 U.S. at 411. We hold that the Magistrate's allocation of fault and damages was not clearly erroneous. *Getty Oil, supra,* 555 F.2d at 334.

We affirm the judgment entered on the decision of the Magistrate, with costs to Whitney Steamship Company in this Court.

Affirmed.

TENNEY, District Judge (dissenting):

I believe that reliance is the touchstone of this case, and that the decision of the trial court as affirmed by the majority opinion stretches the concept of reliance, and therefore the principles of causation, beyond reasonable and permissible limits. Therefore, I dissent.

That the plaintiff in this action must establish that there was reliance on the Buffalo Traffic Buoy in order to prove causation is not a matter in dispute. I diverge from the conclusions reached by the majority and by the lower court on two questions.

The first question concerns the reasonableness of reliance on a navigational aid. Specifically, the question is whether the reasonableness of initial reliance is all that need be shown to establish causation where subsequent circumstances have made continued reliance unreasonable. I believe that if a plaintiff's showing of reliance on an aid is to support a finding of causation, the position of the aid must *reasonably* have affected the intended navigation. That is, the aid relied upon must be an aid which a reasonable navigator would have relied upon under the circumstances. Reliance once engendered by a government chart or publication—i.e., reasonable, initial reliance—will support a finding of causation unless (1) there is either notice or some suspicious circumstance sufficient to dispel such initial reliance *and* (2) the navigator has readily available alternate reliable marks for the course originally intended. I believe that, under the facts in the record, it is clear that what was initially reasonable reliance became unreasonable, and that in the presence of other navigational aids the vessel was not entitled to rely on the presence of the missing buoy.

The second question concerns the existence of reliance on the Buffalo Traffic Buoy in this case. I believe that, even assuming that the vessel was entitled to rely on the missing buoy, she did not do so. I believe that the vessel relied instead on other available aids to navigation.

Thus, under either of these two inquiries I must conclude that there was an insufficient showing of reliance to establish causation. Therefore, I find that the Coast Guard should not have been held liable in this action.

A determination of reliance and reasonableness "involves primarily factual matters, reversible only if the District Court findings are clearly erroneous." *Inter-Cities Navigation Corp. v. United States,* 608 F.2d 1079, 1082 (5th Cir.1979) (citations omitted) (John R. Brown, Circuit Judge) (*"Inter-Cities Navigation "*). Neverthe-

less, "there is clear error when, although there is evidence to support a finding, a reviewing court is firmly convinced that a mistake has been made." *Id.* (citation omitted). I believe that there has been such a mistake in this case. In large part because of the failure of the trial court to recognize the significance of certain evidence in the record—i.e., evidence regarding the "range" maintained by the Coast Guard as an aid to navigation for ships such as the SAM LAUD inbound for the South Harbor—I am left with the definite and firm conviction that an error requiring reversal has been committed by the trial court.

One of the problems with the opinion of the trial court is that it does not make clear the basis on which the court concluded that negligence by the Coast Guard contributed to the groundings of the vessel. The only clue is the finding that "if the buoy had been on station the vessel would have changed course to steer on the buoy and the groundings would not have occurred." This statement implies that the trial court found that it was reasonable for the vessel to rely on the buoy being in place and to go off course when the buoy could not be located. At the same time, however, the court found that "the navigators of the vessel had reason to suspect that the traffic buoy was missing" and that "[u]nlike the situation in *Afran Transport Co.* [*v. United States*, 435 F.2d 213, 215 (2d Cir. 1970), *cert. denied*, 404 U.S. 872, 92 S.Ct. 72, 30 L.Ed.2d 116 (1971) ("*Afran*")] where the buoy was only 50 [sic] yards off station, suspicious circumstances existed so as

to place the navigators of the Laud on notice that they could not continue to singularly rely on spotting the traffic buoy to regulate its course." This finding could only have been prompted by the statement in *Afran* that, "*in the absence of some suspicious circumstance or notice*, navigators are entitled to rely upon the representations made in the Government charts relative to the location of the buoys." 435 F.2d at 215 (emphasis added) (citations omitted).

The majority acknowledges that suspicious circumstances began to appear, but asserts that these occurred well after the initial decision to steer a course toward the buoy. The majority then announces, making reference to *Reliable Transfer Co. v. United States*, 497 F.2d 1036 (2d Cir.1974), *rev'd on other grounds*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), that "[t]he Coast Guard may be held liable for damages if it is negligent in maintaining a navigational aid and such negligence causes an accident, even if circumstances finally make it obvious that the aid is missing or off station before the accident occurs." I am unable to agree that this rule is appropriate on the facts of this case since, if it was clear that the buoy in this case was missing *and* if there were other available aids to navigation, I believe it cannot be said that the *Coast Guard's* negligence caused the accident. Rather, I believe that the accident was caused either by the unreasonable reliance of the vessel on the buoy or by the navigation of the vessel without anything more than *initial* reliance on the buoy.[1]

---

1. This analysis, which is based on an examination of causation, is not to be confused with the doctrine of last clear chance. The latter doctrine, which was developed as a modification of the rule of contributory negligence, permits a negligent plaintiff to recover from a negligent defendant where the defendant had the last clear chance to avoid the harm. Prosser, *The Law of Torts* § 66, at 427–28 (4th ed. 1971). This doctrine is applied when the actions of both plaintiff and defendant have already been found to be contributory causes of the harm—that is, the doctrine is applied after causation has been established.

By contrast, the analysis which I believe should be applied in this case explores whether or not causation by the defendant has in fact been established. The Coast Guard is not charged with negligence in establishing the mark or with stationing an improper mark but rather with failure to discover and report its disappearance and, perhaps, failure to immediately replace it. Presumably, the Coast Guard could have discovered that the mark was missing and could have notified mariners of that fact right up until the time of the grounding. But once plaintiff was aware that the buoy was missing and had laid a new course, see *infra* discussion in text, the Coast Guard's failure to

The majority opinion has summarized the findings of the trial court and no purpose would be served by repetition.[2] However, because the trial court failed to recognize the significance of the evidence in the record regarding the range, I will discuss that evidence before proceeding to treat the questions outlined above.

THE RANGE

The range at issue consists of two prominent structures: one, the South Buffalo Pierhead Light ("Pierhead Light") situated on the Stony Point Breakwater which juts out diagonally and to the northwest; the other, the South Buffalo North Side Light, situated on the main breakwater some six or seven hundred yards behind the Pierhead Light. See Plaintiff's Exh. 4. Both structures are listed in the Coast Guard Light List, see 1976 Coast Guard Light List, at 27, Nos. 440 and 441, as is the Buffalo Traffic Buoy, see id. at 25, No. 400. One of these structures on the shore front has a green light, the other a red light. In daylight, such as was present in this case, a ship approaching the South Harbor on a 90° course will see the two structures as one. If the structures do not appear as one, the ship is either to the north or south of the 90° course, depending on whether the rear structure is to the right or left of the forward structure. At night, the relationship between the lights on the two structures provides the same guidance. By design, the Buffalo Traffic Buoy was stationed directly on this 90° course.[3]

As for the usage of the range during navigation, it was stated in Canada S.S. Lines, Ltd. v. Great Lakes Dredge & Dock Co., 81 F.2d 100 (7th Cir.1936): "To navigate a channel by use of range lights it is not necessary that the vessel be exactly in line with them. A competent navigator can tell how much he is off the line of the ranges by observing them, whether one hundred or three hundred feet." Id. at 103.

The captain of the SAM LAUD was well aware of the range, indeed he testified it was the range that alerted him to the fact that he was overshooting the inbound channel. Had he looked at the range earlier he could have followed it to his destination, whether the buoy was on station or missing.

REASONABLE RELIANCE AND CAUSATION

In order for an improperly placed (or missing) navigational aid to be deemed a contributory cause of an accident, courts have held that the position of the navigational aid as represented by the government "must reasonably affect the intended navigation." Inter-Cities Navigation, supra, 608 F.2d at 1082; see Estate of Callas v. United States, 682 F.2d 613, 623 (7th Cir.1982); In re Tug Ocean Prince, Inc., 584 F.2d 1151, 1158, 1161 (2d Cir.1978), cert. denied, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). The representation as to the position of the navigational aid is not a warranty. See United States v. Sandra & Dennis Fishing Corp., 372 F.2d 189, 195 n. 12 (1st Cir.), cert. denied, 389 U.S. 836, 88 S.Ct. 48, 19 L.Ed.2d 98 (1967).

Although the Supreme Court has not explicitly stated that reliance must be reasonable, it is implicit in its opinion in the landmark (or "seamark") case of Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), which defined the obligation of the government in maritime tort cases in relation to navigational aids.

discover and warn was no longer a causative factor.

2. I must except to one finding by the trial court which was accepted by the majority herein. According to the trial court, the captain of the SAM LAUD did not change the 60° course or full speed until around 1150 hours, or after the initial grounding. This finding is contrary to the evidence and is apparently based on the failure of the log to report courses after the 60° course. Moreover, if the course and speed had been maintained the SAM LAUD would have been stranded in water as shallow as twenty feet at 1150 hours. Joint Appendix at 26–27.

3. For vessels inbound to the South Harbor the range would be the main aid to navigation during the winter months when the Buffalo Traffic Buoy was removed from its station. The captain of the SAM LAUD had entered Buffalo Harbor on many occasions in the past in the winter when the buoy was not on station.

The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light ... and *engendered reliance* on the guidance afforded by the light, it was *obligated* to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was *further obligated* to use due care to discover this fact and *to repair the light or give warning* that it was not functioning. *Id.* at 69, 76 S.Ct. at 126 (emphasis added).

The Coast Guard's obligation under *Indian Towing* to give warning of a nonfunctioning aid complements the requirement in the appellate cases that a navigator's reliance on an aid must be reasonable. Once warned by the Coast Guard, the navigator can no longer reasonably rely on the aid. Accordingly, at least one court has held that although the Coast Guard is not absolved of its duty to correct the potentially dangerous condition, "adequate warning may absolve the Coast Guard from liability in particular situations." *Greer v. United States*, 505 F.2d 90, 92 (5th Cir.1974); *In re Tug Ocean Prince, Inc.*, 436 F.Supp. 907, 920 (S.D.N.Y.1977), *aff'd in part and rev'd in part on other grounds*, 584 F.2d 1151 (2d Cir.1978), *cert. denied*, 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). Certainly a Notice to Mariners advising that a buoy was off station would absolve the Coast Guard of liability. *De Bardeleben Marine Corp. v. United States*, 451 F.2d 140, 149 (5th Cir.1971). In such a case the once reasonable reliance engendered by the chart or other publication would have become unreasonable and the navigator would no longer be entitled to rely on the aid.

In this circuit, *Afran* has established the rule that "in the absence of some suspicious circumstance or notice, navigators are entitled to rely upon the representa-

tions," 435 F.2d at 215, in government charts as to the position of aids to navigation. It should be noted that *Afran* equates "suspicious circumstance" and "notice," and that both terms take meaning from a pre-existing reliance on the representation. Thus, *Afran's* rule alone would seem to defeat the proposition that reliance, once initially established, cannot be aborted. If suspicious circumstances develop when a vessel is underway, I believe that under *Afran* the navigator is no longer entitled to rely on the representation on a chart.

The *Afran* court also suggested that if there had been an alternative navigational aid which the navigator could have steered on after becoming aware that the buoy was missing or off station, then the navigator would have been obligated to steer on the alternative aid. In *Afran* the court found that there was no point of reference by which "the most experienced navigator fully familiar with local conditions could ... detect by the use of his eyesight that this displacement of 350 to 400 yards had taken place." 435 F.2d at 216. Nor was there an available range in *Afran*. There were no ready alternatives to the buoy which, unknown to the ship, was off station.[4] The court noted, however:

> If a range is available all the navigator need do is to look up the range. If the buoy is on the range instead of where it is supposed to be the navigator is on notice that it has been displaced. And, if he fails to take the trouble to look, of course he is at fault.

435 F.2d at 218 (citations omitted). The same reasoning would apply to a buoy that, as in the instant case, was supposed to be on the range, but was not.

Both the opinion of the trial court and that of the majority proceed on the theory that an entitlement to reliance on an aid cannot be aborted by subsequent circum-

4. The absence of land-based alternative marks may be an important factor in assessing liability against the Coast Guard. Thus, in *In re Tug Ocean Prince, Inc., supra,* 436 F.Supp. at 922, *aff'd in part and rev'd in part on other grounds,* 584 F.2d 1151 (2d Cir.1978), both the trial court and this court found the Coast Guard not liable for a grounding where the pilot of the tug had persisted in an attempt to find a mark which had been obscured by ice despite the fact that there were two land-based marks by which the pilot could have steered safely—one of which was lighted and visible to the naked eye.

stances. Both opinions, while citing *Afran*, implicitly find that the requirement that reliance be established in order to show causation is satisfied by the existence of reasonable reliance in the first instance. Further, the majority dismisses the suspicious circumstances which the trial court found to exist. Citing *Reliable Transfer Co. v. United States, supra,* the majority states that these circumstances occurred well after the initial decision was made to steer on the buoy.[5]

I disagree, as stated previously, with the majority's reasoning that initial reliance is sufficient to support a finding of causation where there were suspicious circumstances and an alternative navigational aid, and I also disagree with the majority's assessment as to when the suspicious circumstances arose in this case. Contrary to the majority's view, it is clear from the record that suspicious circumstances arose when the SAM LAUD was between four and seven miles from the buoy's charted station. Once suspicious circumstances had developed, the vessel should have made use of the alternative navigational aid which was available—i.e., the range. Since the

vessel was not entitled to rely on the Buffalo Traffic Buoy because suspicious circumstances had developed, and since an alternative navigational aid was available, the off station buoy cannot be said to have *caused* the groundings for the purposes of an action against the Coast Guard.[6]

Further, *Reliable Transfer* does not support the view that, notwithstanding the suspicious circumstances, the Coast Guard should be held liable in this case. In that case, the Coast Guard was found liable for damages incurred in a stranding, even though the navigator was aware that the navigational aid was not functioning for half an hour prior to the stranding. While it is true that in *Reliable Transfer* this court rejected the government's argument that the failure to maintain the breakwater light was a "condition rather than a cause of the stranding," 497 F.2d at 1038, it did so on the ground that the Coast Guard's failure to act was "a but-for cause" of the accident. *Id.*[7] In the instant case I am constrained to find that the trial court erred in its determination that the missing buoy was a but-for cause of the groundings. I reach this determination based on my firm conviction that, as set out below,

---

**5.** In making a factual finding regarding the reasonableness of reliance, among the factors considered are (a) the nature of the navigational aid, i.e., floating or land-based; (b) the exposure of the aid to stormy weather, ice, and waves; (c) warnings in government publications; (d) the lateral displacement of the aid; (e) the prior history of reliability; and (f) the presence or absence of suspicious circumstances. *See Afran Transport Co. v. United States,* 309 F.Supp. 650, 653–55 (S.D.N.Y.1969), *aff'd,* 435 F.2d 213, 215–17 (2d Cir.1970); *cf. Inter-Cities Navigation, supra,* 608 F.2d at 1082.

There is no question that the approach buoy was a substantial structure, although sea-borne and in exposed waters. Coast Guard regulations and government charts warned generally of the vulnerability of other than land-based marks. However, the buoy had a history of reliability, and the finding of the trial court that *initial* reliance was justified cannot be questioned.

**6.** As the discussion immediately following in the text will clarify, this is not to say that the Coast Guard might not be liable for damages incurred after notice or suspicious circumstances *where those damages are found to have been caused by the initial reliance.* However, where the dam-

ages are found to have been caused by navigational decisions independent of any initial reliance on the buoy—as in cases where an alternative navigational aid was employed—the Coast Guard should not be found liable.

**7.** It should be noted that "[t]he sole issue presented [to the Supreme Court in *Reliable Transfer* ] was whether the admiralty rule of equally divided damages should be replaced by the rule of damages in proportion to fault." 522 F.2d at 1382. Indeed, this court stated that "the findings of the district court and of our Court with respect to the proportion of comparative negligence between the parties were not open to review by the Supreme Court, and it expressly so held. 421 U.S. at 401 n. 2 [95 S.Ct. at 1710 n. 2]." *Id.*

Furthermore, it should go without saying that the Supreme Court's decision in *Reliable Transfer* treated the issue of *damages* as distinguished from the issue of *liability.* Thus, the Court's decision did not enlarge or in any way alter the bases on which the Coast Guard might be found liable. Certainly, the decision did not abolish the possibility that sole fault on the part of a plaintiff could be found where the facts so required.

the SAM LAUD did not actually rely on the Buffalo Traffic Buoy.[8]

## RELIANCE IN THIS CASE

The objective evidence does not support any reliance on the Buffalo Traffic Buoy after the SAM LAUD was off Point Abino. Indeed, the trial court never found that the SAM LAUD was relying on the buoy being on station after passing Point Abino. The trial court found: (a) that off Point Abino at 1120 hours the SAM LAUD was .8 miles to the north of the course which she was following and which was recommended by the Lake Carriers Association; (b) that it was customary at Point Abino for inbound vessels "to make necessary course corrections (whether or not the [Buffalo Traffic Buoy] was in sight) for the approach to the harbor"; (c) that, in order for the vessel to head on the charted position of this buoy, such a course change would have to have been "from 62° to approximately 68°"; and (d) that instead of correcting to the right (south), the third mate directed that the course be changed to the left (north) from 62° to a course of 60°, or 8° to the north of the charted station of the buoy. Based on these findings, the trial court determined that any initial reliance on the Buffalo Traffic Buoy played no part in the change in course from 62° to 60° off Point Abino since the SAM LAUD was not steering toward the charted position of the buoy, but was some .8 miles north of the course on the buoy. Therefore, the trial court concluded that "there was no reliance on the buoy at that time." The court found that the change in course farther to the north—"away from rather than towards the charted position of the buoy"—was "indicative of the want of exercise of due care on the part of the plaintiff which was totally independent of any conduct of the defendant." Moreover, the court never made a finding of reliance thereafter.

What the trial court failed to appreciate was the presence and function of the range and that the change of course to the north rather than to the south was not careless but deliberate. Despite the protestations of reliance on the buoy by the third mate and the captain of the SAM LAUD, neither attempted to steer on the charted position. When the captain relieved the third mate "[at] approximately 1140 hours" the latter advised him of the 60° course, and the captain continued on that course with no reduction in speed. If the SAM LAUD did not rely on the buoy when off Point Abino it is difficult to see how she relied on it thereafter, and, as already noted, the trial court never found reliance beyond that point. If the vessel no longer relied on the buoy *she must have relied on the range.*

The cause of the bottoming was a misjudgment of time and excessive speed. The captain took over the con too late and therefore attempted to turn onto the range too late and at full speed, neither of which faults is attributable to the Coast Guard. The captain testified that he observed the range—that it was starting to open up— and knew he was on the range or slightly north of it, that he ordered a turn to 65° and then 70°, and that, when he saw the range still opening, he ordered that she be steered on the Saskatchewan Elevator just north of the range. Joint Appendix at 240, 241, 245–246. This was a navigational error since he should have headed farther south to come back on the range. However, he believed he was on the correct course and ordered the engines "checked" as was his custom when in the vicinity of the Buffalo Traffic Buoy. He was unaware that the ship had struck bottom shortly after the engines were checked until the second bottoming some ten minutes

---

**8.** Similarly, in *Bouchard Transp. Co. v. Moran Towing & Transp. Co.,* 428 F.Supp. 153 (S.D.N. Y.), *aff'd mem. sub nom. Judy Moran, Tug v. United States,* 573 F.2d 1291 (2d Cir.1977), where the court stated that "[t]he [third-party] plaintiff has the burden of proving that the alleged 'fault' of the [government] was the cause of the grounding and not merely a condition,"

428 F.Supp. at 155, the court dismissed the third-party complaint against the United States on the ground that the third-party plaintiff had failed to show that the "[buoy's] being off station was the proximate cause or the contributing cause of the grounding [of its barge]." *Id.* at 156.

later and accordingly made no further alteration in course.[9]

*The SAM LAUD was two miles from the charted position of the buoy when the turn to the right was made.* To say that that turn was in reliance on the position of an invisible buoy seems farfetched. The trial court found that the course pursued by the SAM LAUD, the failure of the captain to remain on the bridge until the buoy was located, the failure to utilize other aids to navigation, and the excessive speed were evidence of lack of care. Because the trial court failed to appreciate the significance of the range, it did not realize that, failing to see the buoy off Point Abino, *the SAM LAUD must have decided to come in on the range.*

Since for the foregoing reasons I believe that the Whitney Steamship Company has not satisfied the requirement that causation be shown in order to establish liability of the Coast Guard, I would reverse with instructions to dismiss the complaint.

---

**9.** Although the trial court did not make findings as to the courses pursued by the SAM LAUD in turning to the right from the 60° course (presumably because such courses were not entered in the deck log), the courses set forth hereinbefore are clearly supported by the record. *See supra* note 2.