Jose FIGUEROA, Sr., individually and as Administrator of the Estate of Jose Figueroa, deceased, and as Administrator ad Prosequendam of the Estate of Joseph Figueroa, deceased, and as Guardian ad litem for Marisol Figueroa a minor, and David Reya, individually, Plaintiffs,

v.

DEPARTMENT OF the ARMY, Army Corps. of Engineers, Department of Transportation, United States Coast Guard and Government of the United States of America, Defendants.

No. CV–82–2301 (MAC).

United States District Court, E.D. New York.

May 6, 1988.

Robert J. DeBoissiere, Staten Island, N.Y., for Jose Figueroa, Sr., et al.

John R. Bolton, Asst. Atty. Gen., Andrew J. Maloney, U.S. Atty., Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civ. Div., U.S. Dept. of Justice, New York City by Lawrence B. Brennan, James E. Mercante, for defendants.

## MEMORANDUM AND ORDER

### COSTANTINO, District Judge.

This action was brought by plaintiff, Jose Figueroa Sr. as administrator of the estate of Jose Figueroa, deceased, and as *guardian ad litem* for Marisol Figueroa, the daughter of the deceased, and by David Reya, against the United States of America.[1] The plaintiffs seek damages for personal injuries and wrongful death as a result of a boating accident that occurred on August 30, 1980. This action is brought pursuant to the Suits In Admiralty Act, ("S.I.A.A."), 46 U.S.C. §§ 741–752. Trial of this action commenced on October 28, 1986, and was continued over several days. The following constitute this court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

**1.** The United States is the only properly named defendant in this action. *See* 28 U.S.C. §§ 1346(b), 2679(a); *Myers and Myers, Inc. v.*

### Findings of Fact

On August 30, 1980, Jose Figueroa and David Reya were involved in a boating accident on the Arthur Kill. Arthur Kill is a waterway that runs between the western side of Staten Island and the eastern shore of New Jersey. The plaintiffs contend and proffered evidence at trial to show that the accident was caused by a collision of the plaintiffs' boat and a submerged barge alleged to lie adjacent to or encroach upon the dredged navigation channel. It is the plaintiffs' contention that the channel marker buoys, specifically, buoys numbers four and six were negligently placed in that the submerged barge's proximity to the navigable channel created a hazard to navigation. The plaintiffs argue that the United States had a duty to keep the navigable channel free and clear from obstructions and that the United States Coast Guard should never have positioned the buoys on a line intermingled with submerged wrecks without physically marking those wrecks.

In the waters of the Arthur Kill, a navigable channel has been dredged to allow for the safe passage of vessels. The channel is marked by channel buoys. These buoys are not designed to mark wrecks or obstructions. The particular area of the Arthur Kill with which this case is concerned is that section of water which runs from just north of the Outerbridge Crossing to as far north as Port Socony. This portion of the Arthur Kill is marked by buoys numbers four and six. The distance between these two markers is approximately a half a mile. (Exhibits 1, 2, 0). The navigable channel is on the western or New Jersey side of the buoys. Outside of the channel the water varies in depth and contains many sunken and partly submerged wrecks. The wrecks are charted by means of words and symbols on navigation charts. One such chart was admitted in evidence. (Plaintiff's exhibit 1).

David Reya and Jose Figueroa were employed at the Dana Transport Co. in Perth

*United States Postal Service,* 527 F.2d 1252, 1256 (2d Cir.1975).

Amboy, New Jersey. (Tr. 4).[2] On August 30, 1980, Reya and Figueroa met after work and decided to go boating. Reya testified that at first, he told Figueroa that he was tired and did not want to take the boat out, but Reya eventually acceded to Figueroa's request. (Tr. 4).

Reya was the owner of the "Rainy Day." (Tr. 3, 11). The boat was made of fiberglass and measured twelve feet in length and five feet in width. It was equipped with a Mercury outboard motor which also served as the boat's steering mechanism.[3] (Tr. 3, 4, 15, 16, 17). Reya had made several modifications to the vessel including addition of a small plywood deck, the repositioning of the fuel tank, and the addition of a steering wheel system. (Tr. 20, 21, 22). The boat had no windscreen for the operator, nor did it have seatbelts, boat lights, or navigation charts. (Tr. 24, 30, 41, 42).

Reya testified that he and Figueroa launched the boat at around 6:00 P.M. from a boat ramp located in Sewaren, New Jersey. (Tr. 6, 15). According to Reya's testimony, after launching the boat they "went down Great Kills toward the bay; went up Great Kills, killed a lot of time and [Reya] really had no intention of letting [Figueroa] drive it. [When they] came back, the boat ramp was filled with boats." (Tr. 5).

Reya testified that he then let Figueroa drive the boat in that area of the channel located near the boat ramp. (Tr. 5, 6). He did so even though he considered it dangerous for someone else to drive. Further, Reya stated that Figueroa had never operated the Rainy Day prior to this occasion. (Tr. 39). According to Reya, he instructed Figueroa how to work the boat's throttle, and then he pointed him at the number four red buoy. (Tr. 44, 45). Reya testified that he watched Figueroa "like a hawk" while he was operating the boat. (Tr. 47). Figueroa guided the boat south toward the Outerbridge Crossing. (Tr. 44). Reya stated that the boat was travelling at approximately 10–15 knots. (Tr. 46). Reya further testified that Figueroa was relaxed while he was at the helm (Tr. 47), (however, at his deposition, Reya said that Figueroa was nervous). (Tr. 47, Deposition of David Reya, 24).

Approximately one minute after Figueroa took control of the Rainy Day, the boat capsized. (Tr. 46). Reya testified that the water was "smooth as a mirror" in front of the boat just prior to the accident. (Tr. 7).

As stated by Reya:

"It flipped over. The motor reved up and I was afraid of getting cut up by the prop. All of a sudden when it sucked water in, I ended up under water."

Mr. DeBoissiere:

"Were you near any object when you ended up under water?"

Mr. Reya:

"I sure was, it was a wooden wall."

Mr. DeBoissiere:

"What did you do with respect to that?"

Mr. Reya:

"I scuba dive; I didn't panic. I tried to get out and tried to find him. I tried to climb up on the thing, but it was just crinkly, I couldn't get a grip."

Mr. DeBoissiere:

"When you came to the surface, did you see your boat?"

Mr. Reya:

"No, when it came back up, it came up underneath me, that's the only thing that saved me. I would be dead now." (Tr. 8, 9).

Reya stated on cross examination that it was light when the accident occurred. (Tr. 30). He remembered that the lights on the Outerbridge Crossing were not on at the time, but he could not recall whether the sun was still above the horizon. *Id.* Reya could not attribute a specific or approximate time to the accident, but he stated that when the boat capsized it was "close to dark." (*Id.*).

Reya was rescued at approximately 9:15 P.M. at a location two to three hundred

---

**2.** Citations marked "Tr" are to the trial transcript.

**3.** There was some dispute over the exact power of the engine. *See* Tr. 16–17. This issue is not germane in light of the Court's findings.

yards south of the Port Mobil dock. (Tr. 152). Jose Figueroa's body was recovered on September 1, 1980. An autopsy was performed on the following day. It revealed that the cause of Figueroa's death was asphyxia by drowning. (Defendant's Exhibit B).

*Conclusions of Law*

■ It is a long accepted proposition of law that the Coast Guard is under no duty to establish navigational aids for maritime traffic. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Eklof Marine Corp. v. United States*, 762 F.2d 200 (2d Cir.1985); *Whitney Steamship Co. v. United States*, 747 F.2d 69 (2d Cir.1984). Although the Coast Guard has been given the statutory discretion to "establish, maintain, and operate" aids to maritime navigation, (14 U.S.C. § 81 (1982)) there can be no liability in cases where the Coast Guard has failed to act. *Eklof Marine*, 762 F.2d at 202. However, "once the government exercises its discretion to operate navigational aids and engenders reliance on the guidance afforded by such aids, it thereafter is obliged to make certain that they remain in good working condition." *Whitney Steamship Co.*, 747 F.2d at 72. "Reliance is an essential element in a case for damages against the Coast Guard." *Id.*

■ Simply stated, in order for the plaintiffs to establish liability, they must prove: 1) that the government abrogated its discretionary function immunity by taking some affirmative action (i.e. placing a navigational buoy or erecting a lighthouse) thus giving rise to reliance and a duty to use reasonable care, 2) that the government breached its duty through some negligent act (i.e., placing the buoy in such a way as to create "a trap for the ignorant or unwary rather than a warning of danger[.]" *Somerset Seafood Co. v. United States*, 193 F.2d 631, 635 (4th Cir.1951)) or omission (i.e. failing to use due care in maintaining the lighthouse), and 3) that the

government's breach was the proximate cause of the plaintiffs' injuries.

■ In the instant case, the plaintiffs contend and offered evidence at trial to show that the Coast Guard was negligent in its placement of channel marker buoys numbers four and six. The plaintiffs assert that these buoys were placed in such close proximity to a submerged wreck that the eastern edge of the navigable channel, which boaters may reasonably expect to be free from hazards, is not safe for navigation. Therefore, the Coast Guard was obliged to mark the wreck with a buoy or remove it from the area. *See* Plaintiffs' Proposed Findings of Fact and Conclusions of Law, pp. 11–13.

Based upon the evidence received at trial, the Court finds that although the government took the affirmative action of marking the dredged navigation channel with buoys four and six, the government was not negligent in placing those buoys. Consequently, the Court further finds that the government was not obliged to mark, and thus did not negligently omit to mark the submerged wreck which lies between buoys four and six.

First, it is clear from the evidence that the subject wreck is not in, nor does it encroach upon the dredged channel.

Captain Carl M. Huss, the plaintiffs' expert, testified on direct examination that the submerged wreck which plaintiffs allege caused the accident lies "very close" to the boundary line of the deep water channel. (Tr. 70). During cross-examination, Captain Huss measured the distance between the wreck and the navigation channel with a pair of dividers. Although he stated that it was difficult to measure with the scale on the dividers he used, he stated that the wreck was approximately twenty-five yards from the line of the channel.[4] (Tr. 87). Based upon all the evidence adduced at trial, the Court concludes that

---

**4.** Although there was testimony that buoys four and six are not fixed and that they move with the current and the wind, (Tr. 71, 139) it is clear that the current, which runs north and south, would not have moved the buoys closer to the

submerged wreck. Further, it appears that the wind was calm on the night of the accident (Tr. 58) and that any east-west wind that might have come up would have had little effect on the position of the buoys. (Tr. 139).

the positioning of buoys four and six so that the eastern edge of the dredged navigation channel was approximately twenty-five yards from the submerged wreck was not negligent.

In light of the fact that the wreck lies approximately twenty-five yards from the channel and that the wreck appears on navigation charts, the government could not reasonably foresee that the placement of the buoys would result in the accident that caused the plaintiffs' injuries.

Moreover, it is noteworthy that not even the plaintiffs' expert stated that the government failed to use reasonable care in positioning buoys four and six. In fact, there is no evidence that would support such a conclusion.

Accordingly, the Court finds that the government's liability cannot be predicated on the positioning of buoys four and six.

■ The Court also finds that the plaintiffs have failed to establish by a preponderance of the evidence that the submerged wreck which lies between buoys four and six was the proximate cause of the accident. This conclusion is based on the testimony of several witnesses who testified about the time and location of the accident and of the rescue of Mr. Reya.

The plaintiffs contend that the accident occurred at 7:15 P.M. Mr. Reya testified that he looked forward only seconds before the accident and observed that the water in front of him was "smooth as a mirror." (Tr. 7). If the Court accepts 7:15 P.M., as the time of the accident, it is obvious, based upon the testimony of Captain Huss and Mr. Reya that the accident could not have occurred at the site of the suspect wreck. Captain Huss stated on cross-examination that mean low water at buoy six occurred at 6:29 P.M. (Tr. 134). Slack water, the time between the change from outbound current to inbound current, occurred at approximately 7:00 P.M. (Tr. 73). The flood current began at the casualty site at 7:49 P.M. (Tr. 108). Captain Huss also testified that at mean low water, the wreck is usually exposed approximately four feet (Tr. 70–71, 134–138). Thus, it is clear from the evidence that the accident could not

have happened as the plaintiffs claim it did. If the plaintiffs' boat capsized at 7:15 P.M., it could not possibly have capsized upon the wreck between buoys four and six. The water in front of the boat immediately before the accident would not have been "smooth as a mirror" at that time. Rather, the wreck would have been protruding approximately four feet out of the water. Further, in light of the evidence that there was still a significant amount of daylight at that hour (Tr. 7, 109), it is unlikely that Mr. Reya would have overlooked such an obvious hazard. Thus, the Court concludes that if the accident occurred at 7:15 P.M., as the plaintiffs contend, they did not strike the "submerged" wreck between buoys four and six.

In light of the evidence which was presented at trial, however, it is much more likely, and indeed the Court finds that the accident occurred at approximately 9:15 P.M.

On the night of the accident, the tugboat Mobil 2 arrived at Port Mobil at 8:15 P.M. (Tr. 169). Douglas Kimball, the Chief Engineer on the Mobil 2 testified that shortly after arriving at Port Mobil, he observed a small boat go past the Mobil 2.

Q  On this evening, Mr. Kimball, do you remember anything unusual that occurred in that area where you had docked at Port Mobil?

A  Yes. We had arrived at Port Mobil and had been there for maybe five or ten minutes and I was in the engine room. It was full dark outside, I would say probably 8:30 at night and I stepped out onto the deck. The lighting in the engine room was very bright and I came out onto the deck. The deck lights weren't on on the tug and I came out. The tug was lying parallel to the dock with the bow north and I came out on the portside of the vessel on the water side, not expecting anyone there and out of the darkness a small boat came.

He was running parallel with the dock, probably ten to twelve feet off the tug headed north and someone hollered. Jesus, I wasn't expecting anything. I

90

said what the heck, what is this here, and it just kind of startled me and this boat came by top speed, I would say 15 knots or so and they went headed north beyond where I was and the boat was being rocked from one side to the other.

A person in the stern had a hold of the gunnels, just kind of rocking it, just a couple of guys having a good time, two people in the boat and it looked like they were having a pretty good time.

Q About how close did the small boat come to the side of your tugboat?

A I would say ten to twelve feet off, very close, very close.

Q What, if anything, did you do next?

A I went into the galley. There is a television there, the crew lounge, and deckhands were there and the Captain had come in and we just kind of—we were going to watch television and I mentioned this boat going by and the captain said that he had seen it also running around. There weren't any lights on it. There were no lights, two occupants and kind of operating erratically in that area.

While we were in the galley, the portholes were open. It came by again, headed south further off than it was the first time but still fairly close and then the next twenty minutes, half an hour, it came by probably a total of three times, distance varying, not as close as the first pass, but all fairly close and kind of—it was the topic of the evening.

We had gone through a long summer on Long Island Sound and we run into a lot of pleasure boaters and problems. We kind of try to watch for them, not to run them over and we felt it was pretty dangerous with no running lights on it and the way they were operating it.

Q You said the boat had no lights. Are you referring to running lights? Did the boat have any other light?

A No.

Q Were there any other boats in the area that evening?

A No. I guess there was a ship in and there was a barge but no pleasure boats.

Q Were there any other small boats operating in the area?

A No, no.

Q Now, you said you went into the galley and the Captain was there?

A Yes.

Q Now, what, if anything, did you say to the Captain?

A We just kind of discussed like I said, Jesus, did you see this boat that just came by and yes, he had been aware that it was in the area. He had seen it from the pilot house before I take it, and just kind of talked about pretty boaters, pleasure boaters. We do run into them in the summertime quite often.

Q Will you describe the occupants of the boat in the stern of the boat and you testified that he was rocking the boat?

A Yes.

Q Would you describe for the Court what you mean by rocking the boat?

A He had his hand on each gunnel. It was a very small boat. I would say eleven or twelve feet long, pretty easily reached the side of the boat, and just like how you rock a boat with a kid in it, just going back and forth and it was probably going down a foot on each side, back and forth, as it moved through the water.

Q Now, is that side to side motion or back—

A Side to side motion.

Q About how many passes did the boat make by your tug?

A Altogether I would say three to four.

THE COURT: How many?

THE WITNESS: Three to four.

Q And you said you approximated the speed at about 15 knots?

A I would say it was around. It is pretty hard to judge that but as fast as it would go. The engine was full tilt. I would say probably fifteen.

Q You testified, Mr. Kimball, that they were yelling, I believe?

A Yes.

Q Were you able to make out anything that was being said?

A No, just it seemed like they were enjoying themselves, having a good time and just hooting and hollering, just raising hell, just having a good time. (Tr. 146–150).

Kimball testified that the boat made several passes of the Mobil 2 and on cross-examination, he stated that one half to three quarters of an hour elapsed between the time he first observed the boat pass and the time it last went by the Mobil 2.

Shortly after witnessing these events, Kimball was informed by a dock worker that a small boat had capsized by the south end of the dock. (Tr. 151). When the Captain was informed of what had happened, the Mobil 2 proceeded south to attempt a rescue. As they arrived, Kimball observed other rescuers taking Reya out of a "Boston Whaler" and placing him on the dock. The Mobil 2 was informed that one other person was still in the water, and they continued to search for "quite a while." Eventually, they spotted the Rainy Day and pulled it onto the dock of the Mobil 2. (Tr. 150–153).

On plaintiffs' exhibit 1, Mr. Kimball marked the location where the Rainy Day was recovered. That location was two to three hundred yards south of the Port Mobil dock. (Tr. 152).

The Court finds the testimony of Mr. Kimball to be both credible and illuminating. Based on that testimony, the Court finds that the boat which made the repeated north and south passes of the Mobil 2 was in fact the Rainy Day. Although it was "full dark," Kimball observed that the boat which passed was ten to twelve feet long, contained two occupants, and had no lights of any kind. This description matches that of the Rainy Day. Kimball also stated that he observed no other small boats in the area. Moreover, the timing of the events witnessed by Kimball indicates that the boat in question was the Rainy Day. Kimball first observed the boat between 8:15 P.M. and 8:30 P.M. (Tr. 146, 159). Approximately thirty to forty-five minutes later, it passed the Mobil 2 for the last time, headed in a southern direction. (Tr. 162).

Approximately five minutes thereafter, the dock worker informed the crew of the Mobil 2 of the accident (Tr. 150–151) and soon thereafter, upon arriving at the scene of the rescue, Kimball witnessed the rescue of Reya which was already in progress. In light of this testimony, the Court concludes that the Rainy Day capsized at 9:15 P.M. at a location 200 to 300 yards south of the Port Mobil dock. This conclusion is buttressed by Mr. Reya's statements to Police Officer Jansen immediately following the accident. Reya stated that he and Figueroa were boating for about three hours and that at approximately 9:15 P.M., their boat struck a submerged barge and overturned.[5] (Tr. 124; Defendant's Exhibit I).

The Court's finding is also supported by the testimony of Captain Huss that if the Rainy Day capsized at 9:15 P.M., and was picked up shortly thereafter, the location of the casualty site could not have been the wreck which lies between buoys four and six. (Tr. 126–127).

In light of the foregoing, the Court finds that the plaintiffs have failed to establish by a preponderance of the evidence that the wreck between buoys four and six was the proximate cause of their injuries. In fact, the evidence clearly shows that that wreck could not have caused the accident.

Accordingly, the Court finds in favor of the defendant on the complaint. The Clerk of the Court is directed to enter judgment against the plaintiffs and in favor of the defendant.

SO ORDERED.

---

5. The plaintiffs construe Reya's statement to Officer Jansen as merely indicating the time of the rescue. In light of all the other evidence in the record, the Court does not accept this construction.